ALICE E. CALDER *v.* EDGAR A. LEVI
[No. 13, January Term, 1935.]

*Decided February 15th, 1935.*

*H. Beale Rollins* and *John E. Magers,* for the appellant.

*Rignal W. Baldwin, Jr.,* with whom were *Harold Tschudi and Semmes, Bowen & Semmes* on the brief, for the appellee.

PARKE, J., delivered the opinion of the Court.

The plaintiff was driving her automobile southwardly on Cathedral Street, Baltimore, with her mother and a friend as guests. It was about noon on Saturday, April

22nd, 1933, and travel was heavy. As she approached the intersection with Monument Street, the traffic signal showed red, and the southbound line of automobiles, in which the plaintiff was proceeding, slowed down and stopped in obedience to the signal, but the automobile immediately following the plaintiff's automobile ran into the end of the plaintiff's automobile. As a result of the force of the impact, the plaintiff was thrust violently forward against the steering wheel, and was seriously injured. The testimony was conflicting with respect to whose negligence was the cause of the accident, and the jury rendered a verdict for the defendant. On the entry of a judgment on the verdict, the plaintiff appealed. The *nisi prius* court granted all the prayers offered by the plaintiff and by the defendant. While the plaintiff excepted to the granting of the defendant's prayers, they will not be reviewed, because her brief does not assign any error in the court's action on the prayers, and rests the appeal on the first ten exceptions to the rulings of the court on the evidence, and, also, on the action of the court in keeping the jury locked up, on a very hot day in a close room, until a verdict was found. Rule 39, sec. 4, of the Rules of the Court of Appeals.

According to the testimony on this record, the plaintiff was forty-five years old and in good health at the time of the accident. She had been teaching in the public schools of Baltimore for twenty-two years and, when she was injured, she was a capable and efficient teacher of English in a high school at a regular salary of $3,000 a year, which had been temporarily reduced to $2,700 on account of the fiscal stringency. She lived with her widowed mother, and was the support of the family, which included a crippled brother and two small children. As a result of the accident she sustained physical injuries and nervous shock, which were followed by a highly nervous state that existed, with some improvement, at the trial of her action, and had prevented her from teaching. She was attended by the family physician from the day of the accident.

Three days after the accident, a doctor of osteopathy was called in to treat the plaintiff, with the consent of the family physician. The doctor of osteopathy was graduated from a school of osteopathy in 1904, took postgraduate courses and work, and passed the state board examination in Indiana which, according to the testimony, gave the same examination to applicants whether of the allopathic, homeopathic, or osteopathic schools. After practicing two years in Indiana, the doctor came to Maryland, where she has practiced for twenty-eight years. From the beginning of her professional services on April 25th, 1933, to June 18th, 1934, the day of the trial, the osteopathist regularly attended the plaintiff, and her testimony disclosed a familiarity with the plaintiff's physical condition and the symptoms of her nervous disorder. After testifying that the plaintiff's condition would not permit her to teach or engage in any remunerative work, and stating the reasons for this conclusion, the witness was asked if she could state how long this incapacity would exist, and she replied that this future development "is really almost impossible for anyone to prognose." The doctor was then asked to state, first, whether it was possible for her to say whether or not the patient had a permanent or temporary condition; and, secondly, if she could say whether the plaintiff would be able, if ever, to return to teaching. The refusal of the court to allow the witness to answer these two questions constitute the errors assigned by the first and second bills of exceptions.

Osteopathy as a system of treatment which is based on the theory that diseases are chiefly due to deranged mechanism of the bones, nerves, blood vessels, and other tissues, and can be remedied by manipulation of these parts, has legislative sanction, and its practice is authorized by those having the prescribed qualifications. Code, art. 43, secs. 349-362. The testimony of the osteopathist brought the illness of the plaintiff within the domain of osteopathy, and she was qualified as its practitioner to express an opinion in a matter within her art, and with reference to conditions which she had either personally observed

or ascertained by exploratory investigation. *O'Dell v. Barrett,* 163 Md. 342, 346, 347, 163 A. 191. However, the witness had stated that it was "almost impossible" to predict the duration of the plaintiff's sickness, and she was, therefore, unable to give a prognosis except in the terms of the possible. It would have been error to permit these questions to be answered, because her previous testimony disclosed that her relevant and material knowledge of this subject had been previously exhausted. Expert testimony of a future consequence of a prior and subsisting injury as evidence of prospective damages must be in terms of the certain or probable and not of the possible.

The sixth and eighth and tenth bills of exceptions were taken to questions which were not answered, and so do not present any question for determination on appeal. It is true that these questions, after the interposition of another question, were repeated, but it was the repeated questions which were answered without objection, and the plaintiff must be held to have abandoned the objections. Later, in the course of his testimony, the same witness, in response to similar inquiries, gave testimony to the same effect, without any objection by the plaintiff. It follows that, even if these bills of exceptions could be considered, any error in the rulings would not be such prejudicial error as to cause a reversal.

The seventh bill of exceptions presents the propriety of asking a specialist in nervous and mental diseases what, in his opinion, was the condition of the plaintiff immediately after the accident. The witness had no personal knowledge of her condition at the time specified. He had, however, over a year after the accident, examined the plaintiff at the instance of the defendant; and he had received a history of the case and he had heard all the testimony at the trial. The question propounded involved the physical injuries received, as well as her mental and nervous state as the result of the accident. In the absence of any personal knowledge on this subject at the happening of the accident, the expert witness could only express an opinion on the assumption of the truth of the facts

in evidence, which would constitute a complete and consistent representation of that condition of the plaintiff with reference to which the expert's opinion was desired. The question asked was not hypothetical in form, and so was improperly framed, and should not have been allowed, and the answer was prejudicial to the plaintiff.

The ninth bill of exception is to the testimony of another expert in neurology and psychiatry, who had been present in court during the trial of the case. After the witness had stated that he had an opinion as to whether or not the plaintiff was unconscious at any time after the accident, he was suffered to give that opinion in response to a question which required the witness to assume the truth of the testimony he had heard in court, disregarding the opinion of other witnesses and inferences based on them. The form of hypothetical question here employed has been used without disapproval in appropriate instances, but in this particular case, there was testimony on the part of the plaintiff tending to prove that she was unconscious after the accident, and testimony offered by the defendant to the effect that she was conscious. It was impossible for her to be simultaneously conscious and unconscious, and so the truth must be one of the two versions. It was beyond the power of the witness to make the assumption required by the question and express an opinion. In order to answer the question in either way, he had to reject one version as untrue, and this choice compelled him to usurp the function of the jury and decide upon the credibility of witnesses and the weight of the evidence. The question was improperly framed and should have been disallowed. *Quimby v. Greenhawk,* 166 Md. 335, 338-340, 171 A. 59.

The remaining bills of exceptions are the third, fourth, and fifth, which challenge the propriety of the action of the *nisi prius* court in refusing to let the plaintiff testify.

The plaintiff did not sit with her counsel, but sat outside the bar in one of the front seats provided in the body of the court room for witnesses and spectators. As the court was about to take its midday recess, counsel for

the defendant, for the purpose of the record, called the court's attention to the fact that he had been informed that, when Dr. Gillis expressed the opinion that it was doubtful whether the plaintiff would return to her school in the fall, the plaintiff started to cry and fell against the person sitting next to her, and had to be taken out of the court room. The presiding judge remarked that he had observed this behavior of the plaintiff, and, after recess, had a conference with counsel in chambers.

At this stage of the trial, there was testimony in the case that the plaintiff had been rendered extremely nervous as a result of the accident. Her condition was manifested by excessive crying, by the frequent trembling of her body, by the jerking of her muscles, and by the shaking of her arms and legs. When she would refer to her injury she would break down and sob. The plaintiff had improved physically, and so had her nervous state, until three or four weeks before the trial, when these symptoms reappeared, as she had a great fear of going to court.

Dr. Gillis, an expert in nervous diseases, had observed the numerous nervous reactions of the plaintiff while in court, and described them, stating "she has been frequently, almost constantly, moving her arms, rubbing the back of the seat, she has been combing her hair unnecessarily, she has been weeping at various times, two or three times, dropping over on the shoulder of some one sitting next to her, and she has had some jerking of the muscles, and some tremor." The testimony further established that these manifestations of nervousness were not simulated, but were genuine and involuntary, and were similar to those previously shown by the plaintiff in her illness. The plaintiff was under her doctor's treatment in order to fortify her for the trial. This treatment had continued for two weeks, and sedatives were being administered. Dr. Gillis was asked whether the plaintiff was in physical condition to take the witness stand. His reply was: "She is in physical condition. That is, she is strong enough, there is no danger of her heart, or any-

thing of that sort, there is no danger of any serious symptoms, but she is almost inevitably going to become very nervous on the witness stand and go through a lot of those curious jerking motions and so on, because she has done so many other times and she is very likely to do it now."

After this testimony had been given, the judge informed the doctor that the case lacked one element of proof, which was whether the plaintiff's automobile had been in any other accident within two weeks, and inquired whether it would be reasonably likely that the plaintiff, if put on the stand to answer that one question, put to her clearly and definitely, could answer without much likelihood of an attack of nervousness. The doctor's reply was: "I think so, if she were told she would be asked only one question, or be told that she would be asked that particular question. What she seemed to fear was a long cross-examination."

When the sitting of the court was resumed, the court and counsel retired to the judge's chambers and counsel for the plaintiff advised the court that they wished to call the plaintiff as a witness in her own behalf, and to question her particularly with reference to proving by her (1) that before stopping her automobile she put out her hand as a warning to drivers behind her, and that her car was standing still for an appreciable length of time before it was struck from the rear, during which she had a conversation with her mother relative to the next place of stopping, and (2) that the automobile had been driven without accident by the plaintiff and her brother-in-law for a period of two weeks immediately prior to the collision for which the action is brought.

The counsel for the defendant made no objection to the offer of the plaintiff as a witness, but, in deference to a suggestion of the court, stated that he was willing to stipulate that she would testify to the use of her automobile for the period of two weeks before the injury without accident, but that he was not willing to stipulate in regard to her putting out her hand and the other details of the accident.

In this situation, the record shows that the judge stated that he had observed from the bench the demeanor of the plaintiff in the court room. He had entered in the record what he had seen. His observations of the plaintiff's behavior were similar to those described by Dr. Gillis in his testimony, but somewhat more detailed. In addition, the court had it set down that he had noticed that the jurors had, for the most part, their attention concentrated on counsel and witnesses, and very seldom had a juror looked towards that part of the court room in which the plaintiff sat. It was further noted that one of the plaintiff's counsel was strongly of the opinion that she could testify without collapse or creating a scene, but that her other counsel was doubtful. These particulars gave the substance of the conference in chambers, and on the return to the court room the judge addressed the jury in these words: "There has been a conference in chambers and the upshot of it is this: Counsel for both sides want to put the plaintiff on the witness stand and the plaintiff is entirely willing to go on the stand, and wants to do so, and thinks she has a right to do so. One of the things to which she would testify, if she did go on the witness stand, is (and I say this because counsel for the defendant has authorized me to say that he is willing to admit that she would testify to that effect if she went on the stand, although he doesn't admit that it is true) that for a period of about two weeks before the accident which is the basis of this suit the only persons who drove the plaintiff's automobile were the plaintiff herself and her brother-in-law, Mr. Peeling, and the plaintiff would testify that during that period the automobile was in no accident of any kind other than the accident which is the basis of this suit. * * * Now, with that agreement in the record, I assume the responsibility of deciding that the plaintiff shall not be permitted to be sworn as a witness and testify, and the reason for that decision I think has already been made clear to you in the questions I asked Dr. Gillis when he was on the stand this morning."

The refusal of the court to permit the plaintiff to testify was put upon the ground that it was for the purpose of securing an orderly trial. The theory that it was error for the judge to deny the plaintiff the right to testify, and to make the above statement to the jury, is presented by the third and fourth bills of exceptions.

After all of the other testimony in chief on the part of the plaintiff had been produced, the plaintiff was again offered for the purpose of proving the facts with reference to her travel by railway, after the accident, from Baltimore to the Adirondacks, and the nature and object of her visit to a friend, and the physical benefit of her friend's nursing. The testimony was material. In declining to allow the plaintiff to testify, the *nisi prius* judge said: "While the court feels that all the aforegoing offer of proof is relevant to the case, and may be of considerable importance to the plaintiff, nevertheless the court has been observing the plaintiff since the beginning of proceedings this afternoon, following the somewhat lengthy conference in chamber hereinbefore adverted to, and has observed that during a large part of this time the plaintiff has been in a state of partial collapse, with her head resting either on the back of the bench or in the lap of her sister; and that at other times she has manifested extreme nervousness, combing her hair and twitching as above described; for these reasons and for the reasons hereinbefore stated, the court feels compelled to adhere to his former position, and to refuse to allow the plaintiff to be called as a witness in her own behalf." The exception to this ruling is the basis of the fifth bill of exceptions.

As the right of the plaintiff to testify was determined with reference to the situation which existed at the time of the rulings, those exceptions must be considered with regard to the circumstances of the case at the time of the rulings, and not at some later stage. It is unnecessary to state the later conduct of the plaintiff, as observed by the court under different conditions. The defendant, however, does urge upon the court that, if there were error in

declining to let the plaintiff testify, it was harmless error, because the plaintiff suffered no prejudice, since, according to the defendant's brief and argument, either all questions bearing on liability and injuries were adequately covered by two or more witnesses for the plaintiff, or stipulations of fact relative to plaintiff's testimony were admitted by the defendant, who waived right of cross-examination, and were read to the jury. If these reasons are sound, there would be no occasion for this tribunal to pass upon the three bills of exceptions last mentioned. The first reason assigned cannot prevail, on several grounds. The plaintiff was the driver of her automobile at the time of the accident, and sustained the injury and suffered personally its consequences. She was an actor witness, and had an objective and subjective knowledge that was far superior to any other witness, who could be no more than a relator of what had been observed with reference to the acts of the plaintiff when the accident occurred, and the course, and subsequent sensations, of the injuries inflicted. In these respects the plaintiff's testimony was primary, and of such a different nature on certain fundamental points of inquiry that it could not be classed as cumulative, in any accurate sense, with respect to the testimony of any other witness relative to these points. Again, there was no testimony by any witness of the nature of the visit of the plaintiff to her friend in New York, and her life and the treatment there for her injuries during the five weeks she remained. Nor is the second reason advanced tenable. When the attorneys for the plaintiff informed the court in chambers that they desired to put the plaintiff on the stand as a witness in her own behalf, and to interrogate her particularly with reference to their proffer to prove by her (1) that before stopping her car, she had put out her hand as a warning to drivers behind her, and that her car was standing still for an appreciable length of time before it was struck from the rear, during which period she had had a conversation relative to the next place of stopping, as testified to by her mother; and (2) that for

a period of at least two weeks before the accident the only persons who drove her car were herself and her brother-in-law, and that during said period the car was in no accident except the one for which the action was brought. The counsel for the defendant was willing to agree, if the plaintiff were not put on the stand, that the plaintiff would testify to the second particular proffer of proof, but not that it was true; but the defendant was unwilling to agree that she would testify in accordance with the first particular proffer of proof. When the court made his ruling on the third and fourth bills of exceptions, he accompanied his ruling with a statement to the jury that counsel for defendant had authorized him to say that counsel was willing to admit that the plaintiff would testify, if she went on the stand, that for a period of about two weeks before the accident which is the basis of this suit the only persons who drove the plaintiff's automobile were the plaintiff herself and her brother-in-law, and that, during this period, the automobile was in no other accident of any kind, but that the truth of this testimony was not admitted. It should be observed that this statement was made to the jury by the court, because the counsel for the defendant consented, and not as the result of the agreement of the plaintiff or her counsel. So the statement made by the court was not a stipulation of fact to go to the jury; nor can its utterance, at a time when the plaintiff had specifically reserved an exception to the court's announced action, require any further exception on the part of the objector.

After all the testimony had been offered by both sides, but before the closing of the case, and while the presiding judge and the counsel for the parties were again in chambers, counsel for the defendant offered to admit that the plaintiff would testify, if a witness, in accordance with the plaintiff's first particular proffer of proof, that she had given a warning of her intention to stop, that her automobile had stood still after so stopping for an appreciable length of time before it was struck from the rear, and that, during this period, she had had a conver-

sation with respect to where she would next stop as was testified to by her mother. Without it appearing on the record that the plaintiff or her counsel agreed that this offer was accepted by them in substitution for the testimony of the plaintiff as a witness on the stand in reference to the facts mentioned, the judge resumed the bench and had the stenographer read to the jury the first particular offer of proof by the plaintiff. For the reasons previously stated, this action cannot be considered either as a stipulation of fact by the parties, or as affecting the consideration of the bills of exceptions under discussion. Again, the plaintiff was offered as a witness for all the purposes of her action, and her exclusion from the stand prevented her from testifying not only to these particular offers, and to the particular offer relative to her visit to New York, but also to every material and relevant fact within her knowledge. Consequently, it must be held clear that the reading to the jury of the two particular offers of proof were neither an adequate, nor an agreed, substitution of fact for the testimony of the plaintiff on the stand, and so did not prevent the rulings of the court on the three bills of exceptions from being prejudicial to the plaintiff.

Since the proof is that the plaintiff was an intelligent and sane woman, without any organic disorder that would make her appearance as a witness in any degree dangerous to her physical, nervous, or mental health, and that her desire to take the stand as a witness was concurred in by her counsel and not objected to by the defendant or his attorney, the single question is the propriety of the action of the court at *nisi prius* in denying, upon his own initiative, the right of such a plaintiff to testify. The justification for such exclusion must be grave and weighty. A commendable purpose is not a sufficient basis for the deprivation of fundamental rights.

At the stage of the action when the questioned rulings were made, the witnesses introduced on behalf of the plaintiff had testified to facts and circumstances, which, if believed, established a *prima facie* case of negligence

on the part of the defendant, which, without fault on the part of the plaintiff, had resulted in a physical injury and simultaneous nervous shock that were, apparently, directly responsible for the transformation of a healthy, vigorous and composed woman to the nervous and physical condition of the plaintiff at the time of the trial. The distressing physical manifestations of her nervous state, which the court had observed, were involuntary, although they were made worse by reason of her dread of the trial. The woman was not a malingerer, and even if her appearance and behavior on the witness stand were distressing to see, and would make the giving of her testimony difficult, and would, probably, result in tears, and the inability of the witness to complete her evidence, without an intermission, to regain her composure, or even require her withdrawal as a witness, the plaintiff could not be denied the right to go on the witness stand.

The reason is that the plaintiff had the right to present to the jury her actual condition as the direct consequence of the alleged wrong of the defendant. Her involuntary nervous movements, her lack of self-control, her nervous state, were properly exhibited to the jury, and even her inability to complete, or even begin, her testimony, if the direct and proximate result of the alleged wrong of the defendant, were evidence of her nervous state, and portrayed, even more vividly and accurately than words, the actual condition of the plaintiff. The grievous nature, and the obvious and distressing indications, of an injury for which the defendant is alleged to be responsible, are no ground for the denial to the victim of the opportunity to appear as a witness against the wrongdoer. If such were the rule, a disastrous physical or nervous injury, if it be so shocking or distressing in its visible or obvious form as to be likely to arouse deep sympathy in the lay beholder, would furnish the test to determine her competency to testify.

It is an essential function of the court to maintain order and assure propriety in the conduct of legal proceedings, by the enforcement of reasonable rules and regulatory

orders. In no other way may the administration of justice proceed with dignity, calmness, and impartiality in its appointed course. A large measure of discretion must necessarily reside in the court, and its exercise will not be reviewed unless it clearly appear that prejudice has resulted from the denial of a legal right. The privilege of a plaintiff to testify orally before a jury is subject to the limitation that it be not abused. The testimony must be decorously given, and any attempt or artifice to excite prejudice, sympathy, or passion, that would tend to prevent a fair and impartial consideration of the case, should be sternly repressed or corrected by the adequate means at the command of the court.

In the case at bar the conduct of plaintiff was a condition of her physical and nervous state. The plaintiff and her counsel did nothing to exaggerate or improperly emphasize the manifestation of her nervous disorders. She sat in an inconspicuous place in the body of the courtroom and out of the ordinary range of vision of the jury. Neither the appearance nor the conduct of the plaintiff was false or simulated, and there was not any basis for an anticipation by the court that the plaintiff's manner of testifying and her actions while on the witness stand would be spurious or marked by simulation. It was probable that the plaintiff might have been unable to proceed with her testimony, but this would have been because of actual conditions beyond the plaintiff's control, and so would have been an illustration of her real nervous state. Again, she might possibly have testified without developing an incapacity to proceed to the end of her testimony or without serious interruption. So, with the plaintiff's desire and physical ability to testify, and with no objection on the part of counsel for the defendant to the plaintiff's taking the stand and testifying, it would seem that the court should not have voluntarily refused to let the plaintiff take the stand, but should have permitted her to be sworn as a witness. If this had been done, the plaintiff would have been accorded her privilege, and the court could then have acted, conformably to the circumstances,

for the enforcement of order and decorum and the assurance to the parties of a fair and impartial trial. Furthermore, if a verdict had been found for the plaintiff in such an amount as would indicate prejudice, excessive sympathy, or passion, it would have been the duty of the court to set aside the verdict and accord a new trial.

While much must be left to the discretion of the trial court, the circumstances on this record leave no doubt in the mind of this tribunal that the action of the lower court in keeping the plaintiff off the witness stand was prejudicial error. It is our judgment that the *nisi prius* judge went too far in his assumption that the effect of the plaintiff's appearance and testimony would have been to give her evidence unfair emphasis and improper emotional effect. The better plan would have been to have put the plaintiff on the stand, and, if a situation had then developed that required the intervention of the court, the plaintiff could have been withdrawn temporarily, or a mistrial directed, and the case continued as the situation required, in order that the plaintiff's deposition might be taken under a commission, in the presence of counsel for the parties, with the right of examination and cross-examination, so that on the next trial, if the plaintiff could not with propriety be allowed to testify on that occasion, her deposition might be read to the jury. The rulings at *nisi prius* not only precluded the plaintiff from going upon the stand and having an opportunity to testify, but, by allowing the case to proceed to a verdict and judgment, also effectually prevented the plaintiff, who was without blame in the matter, from ever having her case heard by a jury on her testimony, either given orally or in the form of a deposition.

See *Willoughby on Constitutional Law* (2nd Ed.) sec. 1122; *Baltimore v. Leonard,* 129 Md. 621, 626, 99 A. 891; *Johnston v. Frederick,* 140 Md. 272, 117 A. 768; *Weeks v. State,* 126 Md. 223, 94 A. 774; *District of Columbia v. Chessin,* 61 App. D. C. 260, 61 Fed. (2nd) 523, 527; *Antel v. Poli,* 100 Conn. 64, 123 A. 272; *Hanye v. State,* 211 Ala. 555, 101 So. 108, 110; *Chawkley v. Wabash Ry. Co.,* 317

Mo. 782, 297 S. W. 20; *Chicago etc. R. Co. v. Meech,* 163 Ill. 305, 45 N. E. 290; *Ivanhoe v. Buda Co.,* 247 Ill., App. 336; *Boyer v. Mo. Pac. Ry. (Mo. Sup.)* 293 S. W. 386; *Blanchard v. Holyoke St. Ry. Co.,* 186 Mass. 582, 72 N. E. 94, 95; *Commonwealth v. Dies,* 248 Mass. 482, 143 N. E. 506, 508; *State v. Cox,* 172 Minn. 226, 215 N. W. 189; *State v. Barrick,* 60 W. Va. 576, 55 S. E. 652; *Selleck v. Janesville,* 100 Wis. 157, 75 N. W. 975; *Wigmore on Evidence* (2nd Ed.) secs. 778, n. 4, 789, 1151, 1158.

The court finds no other errors, but for the mentioned errors in the rulings on the third, fourth, fifth, seventh, and ninth bills of exceptions, the judgment must be reversed.

*Judgment reversed, with costs, and cause remanded for a new trial.*

BOND, C. J., filed a separate opinion as follows:

I think the trial judge should be allowed more latitude of discretion for dealing with the problem which confronted him in the plaintiff's condition.

The question of permitting her to be called to the witness stand in court might be viewed either as a question of her capacity, or as one of maintaining the decencies in the public tribunal, for if the woman could not be examined and cross-examined in open court without violating the decencies, she was practically incapable of testifying there. She should have testified by deposition, if able to do that. It seems to me that the trial court had this question presented to it. If such an obviously disordered woman was able to give full testimony at all in court, she could, as I understand the record, have accomplished it only with very disturbing incidents, and with a strong probability of her collapsing and otherwise violating the decencies and the good order in which a trial judge is required to maintain in the court room placed in his charge. My opinion is that the question having presented itself to the judge, on the scene as he was, his decision should not be interfered with on appeal. The question of the requirements of fairness and lack of

prejudice to the defendant, one on which a number of decisions elsewhere have dwelt, need not, I think, be taken up in this instance, for the court's action was not based on that ground, and the other grounds seem to me sufficient.

The proper method of dealing with these contingencies which arise from illness or emotional disorders in court is generally regarded as a subject for the discretion of the trial judge, and his decision is not ordinarily disturbed by appellate judges studying the occurrence subsequently. "The control of the order of the court room is necessarily within the discretion of the trial court, and unless abused cannot be reviewed." *Antel v. Poli,* 100 Conn. 64, 69, 123 A. 272, 274; *Hudson v. Devlin,* 28 Ga. App. 458, 111 S. E. 693; *In re Hinton's Will,* 180 N. C. 206, 213, 104 S. E. 341; *Blanchard v. Holyoke Street Ry. Co.,* 186 Mass. 582, 72 N. E. 94. The right of a litigant to come to court and participate in a trial of her case, and to give her testimony there, is not open to any dispute. But that private right is not the only right a trial judge has to consider. "A trial in court is never, as respondents in their brief argue this one was, 'purely a private controversy * * * of no importance to the public.'" *New York Central R. Co. v. Johnson,* 279 U. S. 310, 318, 49 S. Ct. 300, 303, 73 L. Ed. 706. There does exist a right in the community to have litigation conducted in its courts in a decent, orderly manner, and the private right and the public requirement may come into conflict and the ordinary right of the litigant have to yield.

An illustration of the necessity of allowing latitude to the trial judge occurred in this same court room in Baltimore City a number of years ago. A woman plaintiff was, without any permission asked, brought into the court room on a litter and deposited on the floor to one side of the jury box, the only space available. Her appearance, with eyes closed, pale and motionless, obviously shocked the sensibilities of everybody in attendance, and at once raised this question of the requirements of decency and decorum. Her physician insisted that she was able to go

on with her trial, that the pendency of her suit weighed heavily on her mind and interfered with any possible improvement in her condition, and that any delay would be very dangerous. Her attorneys, acting upon the advice and at the direction of the physician, were insisting upon going on with the trial, expecting that she would give her evidence and dispose of the case according to the usual practice. The case was ultimately passed for a settlement, but still that emergency will serve for an illustration. In that instance as in this, the trial judge would have had to rely upon his impression and conception of the probabilities. His impression was that the plaintiff could not decently be permitted to testify in court, if, indeed, she could be permitted to remain in the room. And I think it would have been a proper disposition, in which the trial judge should have been supported, if he had, upon the advice given him, allowed the plaintiff's attorneys to proceed as they wished but refused permission to call the plaintiff herself to the stand. That she should not have been called, and could not have been called, was proved afterwards, for the woman died that night. She had been in fact a dying woman. And I consider that case one in which the demands of decency certainly required the trial judge, upon what appeared before him, to prevent calling the plaintiff as a witness if it had come to that.

In this case, Doctor Gillis, called as a witness for the plaintiff, who was suffering from psycho-neurosis, testified that she had a very severe reaction to coming to court, that during the two or three months before the case was reached on the docket she "reacted so extraordinarily severely to coming to court" that he was made doubtful of the possibility of any improvement in her condition after trial. No move was made, however, to have her testify by deposition. From further testimony of Doctor Gillis, and statements of the judge and the attorneys contained in the record, it appears that throughout the trial, as she sat in the court room, she was moving her hands and arms convulsively, combing her hair continuously

for periods of five to ten minutes, frequently closing her eyes, pressing her hands to her head, or burying her head in the shoulder of her physician who sat next to her, on at least ten occasions placing her head in the doctor's lap for periods of from one to ten minutes, visibly sobbing, and during a large part of the time in partial collapse, with her head resting either on the back of the bench on which she sat, or on her sister's lap. During Doctor Gillis' testimony she collapsed, weeping, and was carried from the room. Doctor Gillis, in answer to a question by the court, expressed the opinion that she could testify without much likelihood of an attack of nervousness, at least if her examination should be limited to only one question, and the fact of the limitation made known to her in advance of her being called; that a long cross-examination was what she seemed to fear. One of her two attorneys, Mr. Rollins, after once having expressed a fear that she might not be able to go through with an examination, concluded, after talking to Dr. Gillis, that while she would exhibit on the stand these same manifestations of nervousness, she could give full testimony without any collapse or "scene" in the court room. The other of her attorneys, Mr. Magers, said he was afraid she would break down. The trial judge observed the condition for himself, and necessarily formed his own impressions of the chances and probabilities. Such was the situation with which he was confronted. He could not exclude cross-examination, or adopt a compromise by limiting cross-examination to one question or a small number of questions; fairness to the defendant's interests would presumably have prevented his attorney from agreeing to do so until after he had heard any testimony she might give in chief.

So far as can be judged by one not in the room at the time, and without the advantage of having seen the condition, I am inclined to think the trial court acted rightly. But the question is only whether a judge so placed should be intrusted with a discretion to decide as he did, and be supported in his decision. I am of the opinion that he should be.