919 A.2d 63

**Maurice Galen HUNTER**

v.

**STATE of Maryland.**

**No. 63, Sept. Term, 2006.**

Court of Appeals of Maryland.

March 16, 2007.

582

Brian M. Saccenti, Asst. Public Defender (Nancy S. Forster, Public Defender, on brief), for petitioner.

Brian S. Kleinbord, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., on brief), for respondent.

Argued before BELL, C.J., RAKER, WILNER,* CATHELL, HARRELL, BATTAGLIA and GREENE, JJ.

---

* Wilner, J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the Constitution, Article IV, Section 3A, he also participated in the decision and adoption of this opinion.

CATHELL, J.

This case arises from the conviction of Maurice Galen Hunter, petitioner, for one count of first degree burglary under Maryland Code (2002), § 6–202 of the Criminal Law Article [1] for which he was sentenced to 15 years in prison. In an unreported opinion, the Court of Special Appeals, relying on *Fisher v. State,* 128 Md.App. 79, 736 A.2d 1125 (1999), affirmed the judgment of the trial court. This Court granted the petition for a writ of certiorari filed by petitioner's appellate counsel but denied both the petitioner's *pro se* petition for a writ of certiorari and the State's conditional cross-petition. *Hunter v. State,* 394 Md. 478, 906 A.2d 942 (2006). Petitioner presents two questions for review:

"1. In a criminal trial, is it error for the judge to allow the prosecutor to ask the defendant whether the police witnesses were lying?

"2. If the answer to the preceding question is yes, did the Court of Special Appeals err in holding that the error was harmless, particularly where the underlying facts were contested, the jury sent out notes suggesting that they were struggling with some of the factual issues, and the prosecutor's closing argument augmented the prejudicial effect of the error."

We hold that, under the circumstances of the instant case, the trial judge erred, as a matter of law, by permitting the State to ask the defendant if other witnesses were lying. We are unable to say, beyond a reasonable doubt, that the error did not affect the verdict.

## I. Facts

Late in the afternoon of April 10, 2002, Dorothy Johnson returned to her home on 6707 Yataruba Drive in Baltimore

---

1. " § 6–202. **Burglary in the first degree.**
    (a) *Prohibited.*—A person may not break and enter the dwelling of another with the intent to commit theft or a crime of violence.
    (b) *Penalty.*—A person who violates this section is guilty of the felony of burglary in the first degree and on conviction is subject to imprisonment not exceeding 20 years."

County. She discovered that a basement window on the front of her house had been forced open while she was at work. After inspecting her house, she found that an engagement ring, a combination DVD–VCR player, three cameras, DVD's, CD's, food, money, a wedding band, and a cell phone were missing.

On that same day, April 10, 2002, petitioner pawned Ms. Johnson's engagement ring and other items not related to the 6707 Yataruba Drive address. On or about May 1, 2002, petitioner was arrested for the burglary at 6707 Yataruba Drive and other related crimes.[2] He was tried, in the instant case, in the Circuit Court for Baltimore County on October 1, 2003, on the charge of burglary in the first degree.

At trial, the manager of the pawnshop testified that petitioner was a long-time customer who usually retrieved the items he pawned. The pawnshop manager was unaware of the police coming to the pawnshop to look for anything petitioner had pawned on any prior occasion.

Detective Tyrone Knox testified that after petitioner was taken into custody, he confessed to the burglary at 6707 Yataruba Drive. Detective Knox also testified that petitioner directed the detectives to 6707 Yataruba Drive and pointed it out as the location of the burglary.

At trial, petitioner denied committing the burglary at 6707 Yataruba Drive. He also denied confessing to the burglary and pointing out the address. On direct examination, petitioner testified that he came into possession of the ring when he encountered an old friend, David Hairston, outside the pawnshop. According to petitioner, he was on his way into the pawnshop to pawn some of his own items when Hairston gave him the ring to pawn in exchange for half of the proceeds. Petitioner testified that he provided Hairston's name to the police.

---

2. It also appears that petitioner was arrested for other burglaries which were not a part of the trial giving rise to this appeal. It is unclear on this record whether the other items pawned by petitioner were related to any of those burglaries.

The relevant portions of the State's cross-examination en-sued:

"[The State:]: Mr. Hunter, it is your testimony then that Detective Knox who just came in here and testified lied, right?

[Petitioner:]: I didn't say that.

[Defense Counsel:]  Objection.

[Petitioner:] I'm not even going to say he lied.

[Defense Counsel:]  Mr.  Hunter, just a moment.

[The State:]  I'll withdraw the question, Your Honor.

[The Court:]  He answered it.

[Defense Counsel:]  Move to strike.

[The Court:]  Move to strike the fact that he says no, he didn't say that.  It's okay with me.  I'll strike it.

. . .

"[The State:]  And if the detective were to testify that Mr. Hairston, his name was never brought up to him, that would be a lie?

[Defense Counsel:]  Objection.

[The Court:]  Overruled.

[The State:]  Would that be a lie?

[Petitioner:] I—to be honest with you, I told him numer-ous people, numerous names.

. . .

"[The State:]  You never told the police how you broke into that house, right?

[Petitioner:] No.

[The State:]  And you definitely told them about Mr. Hairston?

[Petitioner:] Yes.

[The State:]  So if the detective were to testify that Mr. Hairston's name—that you never brought up Mr. Hairston's name to him, that would be a lie?

[Defense Counsel:] Objection. Asked and answered, Your Honor.

[The Court:] No, overruled. Cross examination.

[Petitioner:] I guess it would be a lie.

. . .

"[The State:] Sir, you don't personally or didn't personally have anything against Detectives Ramsuer or Knox before this incident, did you?

[Petitioner:] No, I didn't even know them.

[The State:] So they wouldn't have anything personal against you, would they?

[Petitioner:] I would assume not.

[The State:] Can't think of a reason that they would come in and lie about you?

[Petitioner:] Couldn't even tell you.

. . .

"[The State:] In 1992, isn't true that you were actually convicted of a first degree burglary?

[Petitioner:] Yes.

[The State:] And also of a misdemeanor theft?

[Petitioner:] Yes.

[The State:] But your telling the truth today?

[Petitioner:] Yes, I'm telling the truth.

[The State:] And the detective was lying?

[Petitioner:] I'm telling the truth."

Following petitioner's testimony, the State called Detective Ramseur as a rebuttal witness. Detective Ramseur testified that petitioner had made statements to him about his involvement in a burglary at 6707 Yataruba, that he pointed out that address as the one he had burglarized and, to the best of the Detective's recollection, petitioner never mentioned the name David Hairston.

Then, in its closing argument, the State made reference to the conflicting testimony of the Detectives and petitioner on three separate occasions:

"You would have to believe that both of these detectives came in here and lied to you.... You would have to believe that these detectives[,] in some mass conspiracy to convict Mr. Hunter[,] have come in here and lied to you.

. . .

"Ladies and gentlemen, you would have to believe that those two detectives are the biggest liars in the world in order to believe Mr. Hunter's story."

Following closing arguments, the trial court charged the jury with instructions and the jury began to deliberate at 4:20 p.m. (the trial began shortly after lunch that same day). The jury concluded its deliberations at 7:40 p.m. that same night. In its three hours and twenty minutes of deliberations, the jury sent four notes to the trial court. The first question was about pawnshop tickets and a police report not in evidence. Then the jury, at 5:05 p.m., wanted to know whether petitioner had signed a statement or confession. The existence or non-existence of a signed confession was not in evidence. The jury's third note came out at 6:45 p.m. and suggested that the jury could not reach a unanimous verdict. The trial court brought the jury into the courtroom and encouraged them to try and reach a verdict. At 7:05 p.m., the jury asked a confusing question about possession of stolen property to which the court responded that it did not understand the question. No further communications between the court and jury took place until, at 7:40 p.m., the jury returned a verdict finding petitioner guilty of burglary in the first degree.

## II. Standard of Review

In a criminal context, we " 'will not reverse for an error by the lower court unless that error is "both manifestly wrong and substantially injurious." ' " *Lawson v. State*, 389 Md. 570, 580, 886 A.2d 876, 882 (2005) (quoting *I.W. Berman Props. v. Porter Bros.*, 276 Md. 1, 11–12, 344 A.2d 65, 72 (1975)

(quoting *Rotwein v. Bogart*, 227 Md. 434, 437, 177 A.2d 258, 260 (1962))). We have often said that if an appellant or petitioner establishes error in a criminal case, "unless a reviewing court, upon its own independent review of the record, is able to declare a belief, beyond a reasonable doubt, that the error in no way influenced the verdict, such error cannot be deemed 'harmless' and reversal is mandated." *Dorsey v. State*, 276 Md. 638, 659, 350 A.2d 665, 678 (1976); *see State v. Logan*, 394 Md. 378, 388, 906 A.2d 374, 381 (2006); *Lawson*, 389 Md. at 581, 886 A.2d at 882; *Spain v. State*, 386 Md. 145, 161, 872 A.2d 25, 34–35 (2005); *Archer v. State*, 383 Md. 329, 361, 859 A.2d 210, 229 (2004); *Merritt v. State*, 367 Md. 17, 31, 785 A.2d 756, 765 (2001). Thus, in a criminal case, upon a showing that an error is manifestly wrong and substantially injurious we will reverse the judgment of a lower court and, generally, we will only find the error to be harmless if we are convinced beyond a reasonable doubt that the error did not influence the verdict.

### III. Discussion

#### A.

"In a criminal case tried before a jury, a fundamental principle is that the credibility of a witness and the weight to be accorded the witness' testimony are solely within the province of the jury." *Bohnert v. State*, 312 Md. 266, 277, 539 A.2d 657, 662 (1988) (citing *Battle v. State*, 287 Md. 675, 685, 414 A.2d 1266, 1271 (1980)); *Ware v. State*, 360 Md. 650, 678–679, 759 A.2d 764, 779 (2000); *Conyers v. State*, 354 Md. 132, 153, 729 A.2d 910, 921 (1999). Generally, the rule is that it is "error for the court to permit to go to the jury a statement, belief, or opinion of another person to the effect that a witness is telling the truth or lying." *Bohnert*, 312 Md. at 277, 539 A.2d at 662 (citing *Thompson v. Standard Wholesale Phosphate & Acid Works*, 178 Md. 305, 317–319, 13 A.2d 328, 334 (1940); *American Stores v. Herman*, 166 Md. 312, 314–315, 171 A. 54, 55 (1934)). In *Bohnert*, we quoted favorably language that the Court of Special Appeals used in *Mutyambizi v. State*, 33 Md.App. 55, 61, 363 A.2d 511 (1976):

" 'Whether a witness on the stand personally believes or disbelieves testimony of a previous witness is irrelevant, and questions to that effect are improper, either on direct or cross-examination.' "

312 Md. at 277, 539 A.2d at 662. Finally, we have said:

"It is the settled law of this State that a *witness, expert or otherwise,* may not give an opinion on whether he believes a witness is telling the truth. Testimony from a witness relating to the credibility of another witness is to be rejected *as a matter of law."*

*Id.* at 278, 539 A.2d at 663 (emphasis added). Therefore, it is the well established law of this State that issues of credibility and the appropriate weight to give to a witness's testimony are for the jury and it is impermissible, as a matter of law, for a witness to give an opinion on the credibility of another witness.

■ Petitioner, while relying on *Bohnert, supra,* argues that it is error for the trial court to permit the prosecutor to ask a defendant if he is contending that other witnesses were lying. He also points to on an out-of-state case, *State v. Maluia,* 107 Hawai'i 20, 24, 108 P.3d 974, 978 (2005), to provide further reasoning for this argument:

"Such questions, referred to as 'were-they-lying' questions, are improper for the following reasons: (1) they invade the province of the jury, as determinations of credibility are for the jury; (2) they are argumentative and have no probative value; (3) they create a risk that the jury may conclude that, in order to acquit the defendant, it must find that a contradictory witness has lied; (4) they are inherently unfair, as it is possible that neither the defendant nor the contradictory witness has deliberately misrepresented the truth; and (5) they create a 'no-win' situation for the defendant: if the defendant states that a contradictory witness is not lying, the inference is that the defendant is lying, whereas if the defendant states that the witness is lying, the defendant risks alienating the jury (particularly if the contradictory witness is a law enforcement officer)."

Petitioner additionally relies on the *Maryland Evidence Handbook* to demonstrate that "were-they-lying" questions are impermissible:

> "Impeachment techniques that have been disapproved should not be attempted. The most frequent impropriety seems to involve arguing the credibility of other testimony.
>
> Q. Mr. Defendant, you heard Officer Dueright say that you were staggering and stumbling and falling down when you walked back to the intersection.
>
> A. Yes.
>
> Q. Are you saying that he was lying?
>
> "Such interrogation is totally objectionable. *American Stores Co. v. Herman,* 166 Md. 312, 314–15, 171 A. 54, 55 (1934)."

Joseph F. Murphy, Jr., *Maryland Evidence Handbook* § 1303 (3d.1999). For the reasons stated by *Bohnert, supra,* the *Maluia* Court, and Chief Judge Murphy in his treatise on evidence, petitioner urges this Court to adopt a bright-line rule prohibiting "were-they-lying" questions.

Respondent argues that control over the extent and scope of cross-examination of witnesses has traditionally been left to the discretion of trial judges and that this Court's case law does not prohibit "were-they-lying" questions. Moreover, according to respondent, the Court of Special Appeals's case, *Fisher v. State,* 128 Md.App. 79, 736 A.2d 1125 (1999),[3] the lone case in this State squarely addressing the issue of "were-they-lying" questions, expressly permits them to be asked as a means of highlighting contradictory testimony.

We agree with petitioner that *Bohnert, supra,* is controlling in the present case and will begin our discussion of the case

---

**3.** The issue of "were-they-lying" questions was not before this Court in our *Fisher v. State,* 367 Md. 218, 786 A.2d 706 (2001). Certiorari was granted "in order to determine . . . the applicability, in any way, of the common law doctrine of felony murder in [certain] homicides." *Id.* at 225, 786 A.2d at 710. It was affirmed in part and reversed in part on completely different grounds than an issue of the appropriateness of "were-they-lying" questions.

law by examining the two cases that provide the relevant foundation for *Bohnert*. Then we will examine *Bohnert* and explain how the Court of Special Appeals in *Fisher, supra,* misconstrued our holding in *Bohnert*.

In *American Stores Co. v. Herman,* 166 Md. 312, 171 A. 54 (1934), we addressed the issue of whether a witness may characterize the testimony of another witness as true or false. In that civil case, Herman brought suit against American Stores and others to recover compensation for injuries she incurred as a result of the collision of a train, upon which she was a passenger, with an American Stores truck. The jury found for Herman and against American Stores, which then appealed the decision. The appeal was based, in part, on the trial judge's refusal to allow American Stores's attorney to ask the following questions to a witness for Herman:

" 'Q. Did you hear him say that your car passed the south-bound car about four or five houses north of the building line?

A. Yes, sir.

Q. Is that correct?' "

*American Stores,* 166 Md. at 314, 171 A. at 55. We agreed with the trial court that this line of questioning was impermissible because the attorney was effectively asking the witness to say "whether the witness who gave [the statement] [ ] testified falsely.... [O]ne witness cannot be asked to characterize the testimony of another *(Missouri, K. & T.R. Co. v. Lycan,* 57 Kan. 635, 47 P. 526, 528 [ (1897) ] ), since that is exclusively the function of the jury." *Id.* at 314–15, 171 A. at 55. Thus, as early as 1934, we held that "were-they-lying" questions are impermissible in civil cases.

A slightly different set of circumstances existed in *Thompson v. Standard Wholesale Phosphate & Acid Works,* 178 Md. 305, 13 A.2d 328 (1940), where suit was brought by the widow of John C. Thompson against his former employer for damages incurred as a result of his death. There, we addressed the ability of an expert witness to opine on the conflicting testimony of previous witnesses and said:

" 'All courts agree that *if there is any conflict between the witnesses as to facts on which an expert opinion is sought,* the expert witness cannot [in that situation], although he has heard the testimony, be asked to base his opinion on that testimony, because, to reach his conclusion, he must necessarily invade the province of the jury and pass on the credibility of witnesses and the weight of the evidence.' "

*Thompson,* 178 Md. at 318, 13 A.2d at 334 (quoting 20 *Am. Jur.,* § 790) (emphasis added). In other words, *when conflicting testimony is given* and an expert witness is asked to draw a conclusion as to which version of events actually occurred, his or her expert conclusion could influence the jury as to which witness's version of events is more credible. This is not permitted because it is the functional equivalent of asking a "were-they-lying" question to someone who has the additional influence of being an expert.

*Bohnert, supra,* relied, in part, on *American Stores* and *Thompson* and is the controlling case under these circumstances. In *Bohnert,* Alicia, a child under the age of 14, accused her mother's boyfriend, Bohnert, of sexual abuse. There was testimonial evidence tending to show that Alicia may have had improper motivations in accusing Bohnert and there was no physical evidence to support her allegations. Accordingly, "the State's case hinged solely on the testimony of Alicia." 312 Md. at 270, 539 A.2d at 659. The State produced a Department of Social Services investigator who the trial court ruled, over objection, was an " 'expert in the field of child sexual abuse.' " *Id.* at 271, 539 A.2d at 659. The investigator testified that it was her opinion that Alicia was abused. *Id.* The investigator based her opinion on information gathered from interviews with individuals other than Alicia and on her own personal "sense about children." *Id.* at 271–72, 539 A.2d at 660. The investigator admitted to not performing any type of objective test on Alicia. *Id.* at 272, 539 A.2d at 660. Bohnert took the stand in his own defense and "categorically denied the allegations." *Id.* at 273, 539 A.2d at 660. We reiterated the importance of credibility when we said:

"It is perfectly clear, as we have indicated, that the outcome of this case depended on the jury's determination of the credibility of two witnesses, the accuser and the accused. It is equally clear that the opinion of the 'expert in the field of child sexual abuse' was of utmost significance in that determination. If the child's allegations were believed, they would establish both the corpus delicti of the crimes charged and the criminal agency of Bohnert."

*Id.* In its closing argument at trial, the State repeatedly emphasized the importance of the "expert" witness's testimony to the effect that the child was abused.

We concluded, under those circumstances, that the investigator's testimony was inadmissible for two reasons. The first reason was that the "expert's" testimony was based on information taken solely from the child and was not based on objective tests or medically recognized syndromes. *Id.* at 276, 539 A.2d at 662. Thus, the trial court abused its discretion when qualifying the investigator as an expert because her conclusion that Alicia had been abused was a mere guess and because the groundwork for the "expert's" opinion was inadequately supported. *Id.*

Secondly, we also held that the "expert's" testimony was inadmissible as a matter of law because *"a witness, expert or otherwise,* may not give an opinion on whether he believes a witness is telling the truth. *Testimony from a witness relating to the credibility of another witness is to be rejected as a matter of law." Id.* at 278, 539 A.2d at 663 (emphasis added). When the investigator gave her opinion that Alicia was abused, it was:

"[T]antamount to a declaration by her that the child was telling the truth and that Bohnert was lying.... The import of the opinion was clear—Alicia was credible and Bohnert was not. Also, the [investigator's] opinion could only be reached by a resolution of contested facts—Alicia's allegations and Bohnert's denials."

*Id.* at 278–79, 539 A.2d at 663. The investigator's testimony invaded the province of the jury in two ways: "It encroached

on the jury's function to judge the credibility of the witnesses and weigh their testimony and on the jury's function to resolve contested facts." *Id.* at 279, 539 A.2d at 663. Thus, in the criminal context of *Bohnert,* we held that the investigator's opinion was improperly admitted as expert testimony and, even though we did not call them "were-they-lying" questions, *we also held that the trial court erred as matter of law when it permitted the investigator to give her opinion on whether Alicia was telling the truth.*

With this background in mind, the State's reliance on the intermediate appellate court's discussion in *Fisher, supra,* is misplaced. In that case, three adults were accused of abusing and killing a minor child who resided in their house. One of the defendants took the stand, while another defendant sought to impeach her credibility on cross-examination by asking "were-they-lying" questions. The testifying defendant's counsel objected to those questions and the trial court overruled those objections. The testifying defendant's counsel argued to the trial court that "were-they-lying" questions were impermissible under *Bohnert.* The trial court disagreed and distinguished *Bohnert* on factual grounds, saying: " '*Bohnert* talks about [ ] an expert witness giving an opinion that a witness who testified at trial was truthful or not truthful.' " *Fisher,* 128 Md.App. at 152, 736 A.2d at 1163. The Court of Special Appeals, agreed with the trial court, stating:

> "*Bohnert* was concerned with a situation where a non-eyewitness, generally an expert witness, is called for the primary purpose of offering a neutral assessment of the credibility of a testifying witness. That has nothing to do with challenging the veracity of a testifying eyewitness by demanding an explanation of why other witnesses have given contradictory accounts."

*Id.*

The *Fisher* Court, however, misconstrued our holding in *Bohnert.* In *Bohnert,* we clearly stated that there were *two reasons* for concluding that the trial judge erred:

"Our discussion concerning the discretion of the trial judge regarding expert testimony was on the assumption that there may be circumstances in which an 'expert in the field of child sexual abuse' could properly voice an opinion that a child had been sexually abused. Then the admissibility of such testimony would be within the sound discretion of the trial judge. We concluded [in the previous portion of the *Bohnert* opinion] that in the circumstances of this case, admitting the opinion in evidence was an abuse of discretion. *We have an alternative reason, however, for concluding that, in the circumstances of this case, the trial judge erred in admitting the opinion. We think that the opinion was inadmissible as a matter of law.*"

312 Md. at 276–77, 539 A.2d at 662 (emphasis added). As mentioned above, the first reason for our reversal in *Bohnert* had to do with the trial judge's discretion when admitting expert testimony and the second reason, **the one relevant in the instant case,** had to do with the trial judge's erroneous decision, as a matter of law, to admit "were-they-lying" questions. Whatever distinction the Court of Special Appeals was trying to make between its *Fisher* and our *Bohnert,* does not apply in the present circumstances because the questions asked by the State clearly fell into the second category of *Bohnert* questions and were impermissible as a matter of law.

Returning to the present case, petitioner was asked five questions that put him in a position of characterizing the testimony of two other witnesses. He was asked five "were-they-lying" questions. These questions were impermissible as a matter of law because they encroached on the province of the jury by asking petitioner to judge the credibility of the detectives and weigh their testimony, i.e., he was asked: "And the detective was lying?" The questions also asked petitioner to stand in place of the jury by resolving contested facts. Moreover, the questions were overly argumentative. They created the risk that the jury might conclude that, in order to acquit petitioner, it would have to find that the police officers lied. The questions were further unfair because it is possible that neither the petitioner nor the police officers deliberately

misrepresented the truth. These questions forced petitioner to choose between answering in a way that would allow the jury to draw the inference that he was lying or taking the risk of alienating the jury by accusing the police officers of lying. Therefore, the trial court erred in allowing the State to ask petitioner "were-they-lying" questions. When prosecutors ask "were-they-lying" questions, especially when they ask them of a defendant, they, almost always, will risk reversal.

## B.

■ "Once error is established, the burden is on the State to show that it was harmless beyond a reasonable doubt." *Denicolis v. State,* 378 Md. 646, 658–59, 837 A.2d 944, 952 (2003). We said in *Dorsey* that:

> "An evidentiary or procedural error in a trial is bound, in some fashion, to affect the delicately balanced, decisional process. The abnegation of a particular rule upon which the defense intended to rely may often inflict more damage than initially apparent; a meritorious line of defense may be abandoned as a result; an important witness may not be called; strategies are often forsaken. The future course of the trial inevitably must be changed to accommodate the rulings made. It is the impact of the erroneous ruling upon the defendant's trial and the effect it has upon the decisional process which is of primary concern. . . .
>
> "Indeed, requiring the beneficiary of such error to demonstrate, beyond a reasonable doubt, that the error did not contribute to the verdict—and is thus 'harmless'—is consistent with the test required in criminal cases for a resolution of guilt."

276 Md. at 657–658, 350 A.2d at 677. Thus, in this case, the burden is on the State to demonstrate to the reviewing court that the error was harmless beyond a reasonable doubt.

■ The State argues that the trial judge's instructions to the jury, telling them that they were the sole judges of credibility, and the "overwhelming" evidence that petitioner

committed the burglary are sufficient factors to allow this Court to conclude that the error was harmless. We disagree.

The possible prejudicial effect of the "were-they-lying" questions is demonstrated by the number and the combination of the questions themselves, the repeated emphasis on them during the State's closing argument, and, most importantly, the jury's behavior during its deliberations. The jury sent four notes to the trial court. Three asked for additional information or clarification of certain information. One of the questions related to the pawnshop ticket and may have been related to a concern the jury had about the truthfulness of petitioner's testimony that he had pawned the ring for a friend. Another related to whether the petitioner had signed a confession, which may have been referring to the conflict between the officers' and the petitioner's testimony in respect to whether he had confessed and, thus, this jury question may have directly related to the "were-they-lying" questions. The jury's question, in respect to possession of stolen property, may have related to a juror's concern that by pawning the stolen property for a friend, the petitioner must have assumed that the property was stolen. Additionally, the jury sent one note telling the trial judge that they doubted their ability to reach a unanimous verdict. We are unable to say, beyond a reasonable doubt, that the jury was not affected by the "were-they-lying" questions. Therefore, the trial court's error in allowing the questions was not harmless.

## IV.  Conclusion

For the foregoing reasons, we hold that, under the circumstances of the present case, the trial judge erred, as a matter of law, by permitting the State to ask the petitioner if other witnesses were lying. The error was harmful to the defendant because we are unable to say, beyond a reasonable doubt, that the error did not affect the verdict.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED.  CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO REVERSE THE JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE COUNTY**

**AND TO REMAND THE CASE TO THAT COURT FOR A NEW TRIAL. COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID BY BALTIMORE COUNTY.**

HARRELL and BATTAGLIA, JJ., dissent.

Dissenting Opinion by BATTAGLIA, J., which HARRELL, J., joins.

I respectfully dissent.

In this case the Petitioner, Maurice Gale Hunter, asks that we adopt a blanket rule prohibiting "were they lying" questions directed to one witness with regard to the testimony of another; the majority does so with its holding that such questions encroach the province of the jury. I disagree. As Judge Charles E. Moylan, Jr., so cogently stated in *Fisher v. State*, 128 Md.App. 79, 736 A.2d 1125 (1999), the purpose for such questions is not to elicit an assessment of another witness's credibility; the purpose for "were they lying" questions is to focus the jury's attention on contradictions in the testimony of different witnesses and to cast doubt upon the credibility of the witness so questioned.

In *Fisher*, Mary Utley, one of three defendants convicted of second-degree murder, child abuse, and conspiracy to commit child abuse of Utley's daughter, Rita, challenged the permissibility of the following colloquy:

Q: You remember saying to the nurse at Northwest Hospital, that you felt responsible for Rita's death?

A: No.

Q: So if a nurse testified to that, that nurse would be lying?

[Counsel for Mary Utley]: Objection.

The Court: Overruled.

A: I don't' remember saying that to the nurse.

\* \* \*

Q: Would you ever let [Rita] run around at night when she was a small child?

Counsel for Mary Utley: Objection.

The Court: Overruled.

A: No.

Q: You remember Mrs. Deiner testifying the other day?

A: Yes, I do.

Q: So, she was not telling the truth as well?

A: Rita—

[Counsel for Mary Utley]: Objection, Your Honor.

The Court: Overruled.

A: Rita wasn't even, I don't believe, walking at that age.

Q: Well, how about [your other daughter] Georgia, was she walking, was she lying about Georgia running around?

A: As I just said, they would walk around at night like normal children, but again, I don't believe Rita was walking at the age that she said she was out.

Q: *So then Mrs. Deiner was not telling the truth?*

A: *Yes.*

\* \* \*

Q: Now, Detective Walsh, she said, you heard her say that you were laughing after Rita died, *was she not telling the truth?*

A: *She was not telling the truth.*

Q: *And Detective Hill—*

A: *He was not telling the truth.*

Q: I didn't ask the question yet. Was Detective Hill telling the truth when he said you were laughing and you thought Rita's death was a big joke?

A: *He was absolutely not telling the truth at all.*

Q: So both of these detectives, have you ever met them before?

A: Only at the hospital and at the building.

Q: You know of any reason why these detectives would lie to the ladies and gentlemen of the jury?

[Counsel for Mary Utley]: Objection, Your Honor.

The Court: Overruled.

A: I don't know. All I know is that I didn't say what they said I said.

Q: *So, then they were not being honest with the jury?*

A: *That's correct.*

\* \* \*

Q: Rose, your other daughter, said that she never locked you in the room?

[Counsel for Mary Utley]: Objection, Your Honor.

The Court: Overruled.

Q: *Is Rose lying about that?*

A: *Yes, she is.*

Q: *So all these people are lying but Mary Utley?*

A: *That is correct.*

*Id.* at 149–151, 736 A.2d at 1162–63 (emphasis in original). Judge Moylan, writing for the Court of Special Appeals, held that the trial court properly allowed the questions "for the obvious reason that the cross-examination was doing exactly what cross-examination is designed to do," namely, "to expose falsehood . . . as dramatically as possible" by highlighting "the number of witnesses, ideally neutral witnesses with no reason to fabricate, who have given contradictory accounts," *id.* at 149, 151, 736 A.2d at 1162, 1163, and explicated that this line of questioning was permissible because it required Mary Utley to assess her own credibility:

> What Mary Utley was being asked to do was either 1) to acknowledge her own falsity or 2) to look foolish in denying it. Once the final rhetorical question "So all these people are lying but Mary Utley?" was asked, the skillful cross-examiner would have been turning and walking disdainfully away without waiting for an answer. The answer no longer mattered.

*Id.* at 152–53, 736 A.2d at 1163.

Like *Fisher*, the purpose for the "were they lying" questions in the case at bar was not to elicit a credibility assessment of the Detective, but, rather, to draw the attention of the

jury to the existing conflict between the testimony of Hunter and the Detective. Regardless of how Hunter responded, the question of who to believe was left to the jury.

The majority, however, rejects the acumen of *Fisher* and relies instead on an erroneous application of our holdings in *American Stores Co. v. Herman,* 166 Md. 312, 171 A. 54 (1934), *Thompson v. Standard Wholesale Phosphate & Acid Works,* 178 Md. 305, 13 A.2d 328 (1940), and *Bohnert v. State,* 312 Md. 266, 277, 539 A.2d 657, 662 (1988).

In *American Stores Co. v. Herman,* the trial judge sustained an objection to the following questions asked by the American Stores's attorney of one of Herman's witnesses:

Q. Did you hear him say that your car passed the southbound car about four or five houses north of the building line?

A. Yes, sir.

Q. Is that correct?

166 Md. at 314, 171 A. at 55. We upheld the trial court's decision because "[o]ne witness cannot be asked to characterize the testimony of another, since that is exclusively the function of the jury." *Id.* at 314–15, 171 A. at 55 (citations omitted). Unlike in *Fisher* and the case *sub judice,* however, the impermissible question in *American Stores Co.* was clearly being utilized in order to assess whether another witness was accurate in his testimony, which is not the situation before us.

In *Thompson v. Standard Wholesale Phosphate & Acid Works,* we determined that the following colloquy with an expert witness was inopportune:

Q. Now I am asking the Doctor which testimony he is assuming to be true, whether the [employee] struck the radiator pipes or did not strike the radiator pipes?

A. Well, to tell the truth, I do not know whether he did or not because the testimony at one time said he did and at another time said he did not.

178 Md. at 318, 13 A.2d at 334, based upon the well-established rule that:

if there is any conflict between the witnesses as to facts on which an expert opinion is sought, the expert witness cannot, although he has heard the testimony, be asked to base his opinion on that testimony, because, to reach his conclusion, he must necessarily invade the province of the jury and *pass on the credibility of witnesses* and the *weight of the evidence.*

*Id.,* quoting 20 Am.Jur. § 790 (emphasis added). In the present case, conversely, Hunter was not asked to assess the Detective's credibility, nor opine about evidence.

In *Bohnert v. State,* the defendant was accused of sexual abuse. A Department of Social Services investigator, recognized by the trial court as an "expert in the field of child sexual abuse," testified that the child had been sexually abused in contradiction to the defendant's denial. We held that the expert's testimony should not have been admitted because, as in *Thompson,* it invaded the province of the jury by requiring the expert to resolve conflicting evidence and also to assess the credibility of the child and the defendant. 312 Md. at 278, 539 A.2d at 663. Obviously, in both *Thompson* and *Bohnert,* an expert witness was called upon to determine which of two witnesses was telling the truth, which is a prohibited practice. *Stebbing v. State,* 299 Md. 331, 349, 473 A.2d 903, 911 (1984); *Calder v. Levi,* 168 Md. 260, 266, 177 A. 392, 394 (1935). This choice of truthfulness is not implicated in the present case.

Many of our sister states addressing the issue of "were they lying" questions clearly have recognized their propriety. In *State v. Hart,* 303 Mont. 71, 15 P.3d 917 (2000), the Supreme Court of Montana held that there was no prosecutorial misconduct implicated by "were they lying" questions. The court reasoned that such questions did not invade the credibility assessment function of the jury anymore than those questions that elicited facts from the defendant's perspective:

[T]he difference between the defendant testifying that "yes, the victim lied, she attacked me" or the defendant testifying that "she attacked me" is, for purposes of the jury's role in

making credibility determinations, irrelevant. In either situation, the jury must still decide which witness is more credible.

*Id.* at 923. The court went on to distinguish the "were they lying" questions from a prosecutor's comments on an accused's guilt, "which do[ ] invade the province of the jury and ... usurp[ ] ... its function because the jurors may simply 'adopt the prosecutor's views'." *Id.*

Further, in *State v. Johnson,* 273 Wis.2d 626, 681 N.W.2d 901 (2004), the Supreme Court of Wisconsin distinguished between cases in which an expert witness was asked to decipher which of two witnesses testified truthfully, and cases in which one witness was asked if another was lying. The court held that, in the former, the line of questioning is impermissible because it usurps the province of the jury, but in the latter, permissible because

[t]he purpose and effect of the cross-examination of the second witness is to *test that witness's credibility* through his or her demeanor and answers to questions. *It aids the jury in its truth-finding function.*

*Id.* at 908–09 (footnotes omitted) (emphasis added). The court explained that "were they lying" questions do not usurp the province of the jury because they

[are] not placed before the jury to bolster the credibility of the other witnesses. Instead, cross-examination [i]s used to *highlight the inconsistencies in the testimony,* and give the witness an opportunity to explain those inconsistencies. As the court of appeals concluded, the questions posed "were solely to impeach [the defendant's] credibility." Such questions may help the jury assess the credibility of witnesses.

*Id.* at 909 (citations omitted) (emphasis added). *See also Whatley v. State,* 270 Ga. 296, 509 S.E.2d 45, 51 (1998) (holding that the prosecution's "were they lying" questions were permissible because they "merely emphasized the conflict in the evidence, which it was the jury's duty to resolve") (internal quotations omitted).

Many other courts also have refused to adopt a blanket prohibition of "were they lying" questions, acknowledging their probative value in certain circumstances. In *People v. Overlee*, 236 A.D.2d 133, 666 N.Y.S.2d 572 (N.Y.App.Div.1997), the court held that the prosecutor's questions on cross-examination of the defendant, wherein he repeatedly asked the defendant whether another witness was lying, was appropriate and explicated that:

> Here, defendant testified that Santana and the other officers attacked him. The prosecution witnesses testified to defendant's assault of Santana and the other officers. The contradictory accounts cannot be based on mistake or hazy recollection.

*Id.* at 576. Thus, the court reasoned, when such a clear contradiction exists, the only inference that can be drawn is that someone is lying:

> In a situation where a defendant flatly denies the occurrence of events and his involvement in those events, as testified to by the People's witnesses ... the defendant has created a credibility contest.... A prosecutor, as with any advocate, may, provided he does not stray from the record or inject irrelevant issues, cross-examine a defendant as vigorously as possible. Consistent with that right, the prosecutor may, where a direct contradiction ... exists between a defendant's testimony and that of a prosecution witness, ask a defendant whether that witness has lied or is a liar.

*Id.* at 577 (citations omitted). The court underscored that such questioning is not improper because it "in no way signifies a shifting of the burden of proof," but rather, emphasized that, the resolution of the conflict "turn[s] on issues of credibility, [and] depends, in large measure, on the testing for truth." *Id.*

In *State v. Pilot*, 595 N.W.2d 511 (Minn.1999), the Supreme Court of Minnesota also refused to adopt a blanket prohibition of "were they lying" questions, stating, "we do not believe an

inflexible rule prohibiting such questions is necessary or desirable" because

> [s]ituations may arise where "where they lying" questions may have a probative value in clarifying a particular line of testimony, in evaluating the credibility of a witness claiming that everyone but the witness lied or, as in *Overlee,* the witness "flatly denies the occurrence of events".

*Id.* at 518. In those circumstances, the court determined that such questions play a crucial role in assisting the jury in its search for the truth. *Id. See also United States v. Harris,* 471 F.3d 507, 512 (3d Cir.2006) (holding that "were they lying" questions are appropriate if a defendant has opened the door by testifying on direct that another witness is lying, or when it is necessary on cross-examination to "focus a witness on the differences and similarities between his testimony and that of another witness"); *United States v. Bryant,* 770 F.2d 1283, 1291 (5th Cir.1985) (holding that "[w]hen the credibility of a witness is placed in issue the [ ] court has broad discretion concerning the extent to which cross-examination may exceed the scope of direct examination"); *State v. Morales,* 198 Ariz. 372, 10 P.3d 630, 633 (2000) (refusing to adopt a bright line rule prohibiting "were they lying" questions because they "may be appropriate when the only possible explanation for the inconsistent testimony is deceit or lying or when a defendant has opened the door by testifying about the veracity of other witnesses on direct examination").

By holding as it does, the majority adopts an over-inclusive stance which prohibits, under all circumstances, "were they lying" questions, or any variation thereof, which serve to highlight, in oftentimes lengthy and complicated trials, the contradictions that the jury must consider in assessing credibility. "Were they lying" questions are an invaluable tool in our adversarial system which serve to aid the jury in its quest for the truth. Thus, I disagree with the majority's blanket prohibition and would affirm the judgment of the Court of Special Appeals.

Judge Harrell has authorized me to state that he joins in this dissenting opinion.