*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

UNPUBLISHED
March 30, 2026
9:33 AM

Plaintiff-Appellee,

v

No. 367414
Saginaw Circuit Court
LC No. 20-047404-FC

JEROME RANDY ROGERS,

Defendant-Appellant.

Before: KOROBKIN, P.J., and YATES and FEENEY, JJ.

KOROBKIN, P.J. *(dissenting)*.

When the prosecutor urged the jury to "focus" on the fact that defendant said, "when I got caught?" during his police interrogation, the jury had no idea that, in context, defendant was likely referring to being "caught" in connection with a completely unrelated drug case. So it was misleading for the prosecutor to invite the jury to infer that defendant's statement was evidence of consciousness of guilt for *murder*. The record reflects that the jury did, in fact, "focus" on that statement per the prosecutor's request, as they specifically asked to hear it replayed during their deliberations—and proceeded to return a guilty verdict very soon thereafter. In my view, this unfortunate series of events deprived defendant of a fair trial. I therefore respectfully dissent.

The majority's opinion accurately sets forth the facts. For purposes of this dissent, key fact #1 is that a recording of defendant's custodial police interrogation was played for the jury, but excerpts were omitted so that the jury was not made aware that during the interrogation defendant was in custody pursuant to a warrant on unrelated drug charges. On appeal, this Court had the opportunity to review the recording of the police interrogation in unredacted form, and it reveals that defendant was engaged in conversation with the police for more than ten minutes from the beginning of the interrogation until the beginning of the critical portion that was played for the jury. During that time no reference was made to the shootings at issue here; the discussion pertained only to the drug charges and the fact that defendant had been arrested in Chicago on a warrant related to those charges. Defendant stated, for example, "When I first got arrested, the Chicago police asked why did I run from a drug charge I had in Saginaw." Then, at the key point in the interrogation where the recording began playing for the jury, the lead officer (Detective Accardo) asked, "You were located in Chicago back on March 20th, correct?" Defendant

-1-

responded by asking the question, "When I got caught?" In context, then, defendant's question "When I got caught?" appears to be in reference to having been caught for "run[ning] from [the] drug charge [he] had in Saginaw." Yet the jury had no knowledge of the drug charge in Saginaw and was left to fill in the blanks as to what being "caught" might mean. It is appropriate in a trial to exclude evidence of unrelated offenses or allegations when the jury's knowledge of such matters could be prejudicial to a defendant, but in this case the selective editing of the recording had the potential to distort the jury's understanding of the *remaining* evidence in a way that could also be prejudicial.

That brings us to key fact #2: the prosecutor's closing statement. The prosecutor made the following argument to the jury:

> *What I want you to focus on* are particular statements in the interview that you can all listen to if you choose. When asked about the timeframe of when he got to Chicago, he made a statement to Accardo—he asked a question—"when I got caught" in that interview. Innocent people don't say that in an interview. He didn't say when U.S. marshals found me. He didn't say when I got arrested. He didn't say when I went to Cook County jail. When I got caught, that was the phrase that he used. [Emphasis added.]

Ordinarily, of course, a prosecutor encouraging the jury to infer consciousness of guilt from a defendant's use of the phrase "when I got caught" would be neither unusual nor improper. But context matters. And here, the prosecutor knew that defendant's question "when I got caught?" came after a lengthy discussion regarding defendant having been arrested on a drug-related matter, and without any discussion about the murders. What's more, the prosecutor knew that the jury did not know about the drug charges, and so couldn't make its own informed determination about whether the words "when I got caught" evinced consciousness of guilt as to murder or consciousness of guilt as to "run[ning] from [the] drug charge [defendant] had in Saginaw." And worse yet, the prosecutor urged the jury to "focus" on the fact that defendant uttered the words "when I got caught." So the prosecutor not only made a misleading statement, encouraging the jury to infer consciousness of guilt from a materially incomplete set of facts, but also encouraged the jury to "focus" on this point.

The prosecutor's statement was misleading, but was the jury misled? The answer lies in key fact #3. During deliberations, the jury asked to listen to the police interrogation three times. The first time, the jury asked for all the admitted portions of the interrogation, and those portions were played for the jury. The next morning, the jury asked again, and this time they specifically asked, "[C]an we listen to audio segment . . . quote, when I got caught[?]" That segment of the recording was played once for the jury, at which point a juror asked to hear it again, and it was played a second time. About 45 minutes later, the jury returned its verdict. Of course, in any trial it is impossible to know with certainty whether and to what extent any one piece of evidence influenced the jury's decision. But here we know not only that the prosecutor urged the jury to "focus" on the "when I got caught" statement, but also that the jury did focus on it, having specifically asked to hear the recording not long before returning their verdict.

Putting this all together, the prosecutor's statement in the closing argument was prosecutorial misconduct. Claims of prosecutorial misconduct boil down to whether the

prosecutor's statements or conduct deprived the defendant of a fair and impartial trial. *People v Bennett*, 290 Mich App 465, 475; 802 NW2d 627 (2010). Such claims are evaluated on a case-by-case basis so that prosecutors' remarks are considered in context. *Id*. Prosecutors may not exploit or capitalize on testimony they know to be false or misleading. *People v Smith*, 498 Mich 466, 475-482; 870 NW2d 299 (2015). Nor may they vouch for the credibility of witnesses by implying that they have some special knowledge concerning the truthfulness of the testimony. *People v Bahoda*, 448 Mich 261, 276; 531 NW2d 659 (1995). Neither of those rules perfectly fits this case, but there are important similarities. Here, there was no false or misleading testimony as such, but the form in which the evidence was admitted left a misleading impression that the prosecutor then exploited at closing argument, encouraging the jury to draw an inference that was unfair for reasons known to the prosecutor but not the jury. And rather than being a case in which the prosecutor inappropriately implied special knowledge concerning the truthfulness of testimony, here the prosecutor really *did* have special knowledge but misleadingly implied facts inconsistent with that knowledge. *Smith* and *Bahoda* are both examples of the general rule, also recognized by the United States Supreme Court, "that prosecutors' prejudicial or misleading statements violate due process if they render a trial . . . fundamentally unfair." *Andrew v White*, 604 US 86, 93; 145 S Ct 75; 220 L Ed 2d 340 (2025). Keeping in mind that in each case a prosecutor's statements must be considered in context, there is a difference between arguing for reasonable inferences from the evidence and making a misleading statement encouraging the jury to draw an inference that they might well consider unreasonable had they known all the relevant facts. In my view, this case falls on the misleading side of the line.

The prosecution argues that there was no error here because it was not reasonable to think that defendant would have fled to Chicago to escape a drug charge. Respectfully, that is a distraction. The problem is not that the prosecutor argued to the jury that defendant's travel to Chicago showed consciousness of guilt; the problem is that the prosecutor argued that defendant's *statement*, "when I got caught?" showed consciousness of guilt. As discussed, the jury was left to infer that this meant "caught" for murder even though, unbeknownst to them, the statement was made in the context of a discussion regarding defendant's arrest on an unrelated drug offense. Why defendant was in Chicago at the moment he got "caught"—as opposed to some other location—is irrelevant to the issue on which the jury was misled.

The prosecution also argues that defendant's prosecutorial misconduct claim cannot succeed because defendant did not seek a curative instruction at trial. But failure to seek a curative instruction is not fatal on appeal "when an objection could not have cured the error," *People v Callon*, 256 Mich App 312, 329; 662 NW2d 501 (2003), and I agree with defendant that in this situation no such cure was possible. An instruction explaining that defendant's "when I got caught" statement may have been referring to an unrelated drug offense would have merely substituted one kind of prejudice with another. And telling the jury not to "focus" on what the prosecutor just told them to focus on would have been ineffective because the jury was missing the very information that would have explained why the "when I got caught" statement did not merit their close attention. See *People v Messenger*, 221 Mich App 171, 179 & n 3; 561 NW2d 463 (1997). "Although jurors are presumed to follow instructions, some errors cannot be cured with an instruction." *Id*. n 3 (citation omitted). In such cases "an objection would be pointless." *People v Humphreys*, 24 Mich App 411, 415; 180 NW2d 328 (1970).

As discussed by the majority, the plain-error test applies to issues that were not preserved by contemporaneous objection in the proceedings below. For the reasons stated, there was error because the prosecutor's statement was misleading. And it was "plain, i.e., clear or obvious," *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999), because the prosecutor specifically urged the jury to "focus" on a portion of the police interrogation recording with an incomplete understanding of what that evidence signified. The error was plain because it is not "subject to reasonable dispute," *People v Randolph*, 502 Mich 1, 10; 917 NW2d 249 (2018) (quotation marks and citation omitted), that the prosecutor should not have encouraged the jury to infer consciousness of guilt for murder when the jury was unaware that, in context, defendant's statement arose in the midst of a discussion about an arrest on unrelated drug charges.

With plain error established, we must also determine whether it "affected the outcome of the lower court proceedings." *Carines*, 460 Mich at 763. There are unmistakable signs that it did. As discussed, not only did the prosecutor urge the jury to "focus" on this issue, the jury asked to hear the recording again, and the jury's note specifically said, "can we listen to audio segment . . . quote, when I got caught[?]" After that segment of the recording was played for the jury, a juror asked to hear it again and it was played a second time; the jury returned its verdict about 45 minutes later. Michigan law is rather sparse on what a jury's behavior can reveal about whether an error affected the outcome, but in at least one case our Supreme Court took note when a jury's questions for a witness appear to have been influenced by error that occurred at trial. See *People v Swilley*, 504 Mich 350, 378; 934 NW2d 771 (2019). And other jurisdictions explicitly recognize that "the jury's behavior during deliberations," including "jury notes sent over the course of the jury's deliberations," is "a relevant factor" in determining whether an error affected the outcome. *Dionas v State*, 436 Md 97, 111; 80 A3d 1058 (2013).[1] See, e.g., *Hunter v State*, 397 Md 580, 597; 919 A2d 63 (2007) ("The possible prejudicial effect . . . is demonstrated by . . . most importantly, the jury's behavior during its deliberations."); *People v Medina*, 18 NY3d 98, 105-106; 960 NE2d 377 (2011) (finding an error not harmless "under the circumstances present in this case" where "the jury's confusion . . . is evident from its own messages to the court during deliberations"); *Smallwood v Commonwealth*, unpublished memorandum opinion of the Court of Appeals of Virginia, issued February 17, 1998 (Docket No. 1616-96-1); 1998 WL 60908, at *3 & n 4 (stating that "the jury obviously considered [the improperly admitted] testimony important," and noting that "[o]f four inquiries submitted to the jury to the court during deliberations, three related to [that] testimony"). Here, the jury's behavior indicates that the "when I got caught" statement—and thus the prosecutor's misleading statement about it—affected the outcome.

The prosecution argues that there was no outcome-determinative prejudice because there was overwhelming evidence of defendant's guilt. More on that evidence in a moment. First, though, it is important to remember why, in evaluating outcome prejudice as a general matter, we even consider the strength of the evidence. It is not to determine whether we, as judges sitting as an appellate tribunal, are satisfied from the evidence that a defendant is guilty. *Kotteakos v United States*, 328 US 750, 763-764; 66 S Ct 1239; 90 L Ed 1557 (1946). That is exclusively the role of

---

[1] "Although not binding on this Court, caselaw from other jurisdictions may be considered persuasive." *People v Konopka (On Remand)*, 309 Mich App 345, 369-370 n 8; 869 NW2d 651 (2015).

the jury, as guaranteed by the Sixth Amendment and Const 1963, art 1, § 20. See *Sullivan v Louisiana*, 508 US 275, 277; 113 S Ct 2078; 124 L Ed 2d 182 (1993). Rather, because it is so often difficult to know whether an error influenced the verdict, the strength of the properly admitted evidence can sometimes serve, in part, as a rough proxy for the likelihood that the jury's actual verdict was unaffected by the error. See *Delaware v Van Arsdall*, 475 US 673, 684; 106 S Ct 1431; 89 L Ed 2d 674 (1986). Still, our prejudice inquiry is decidedly not about whether a reasonable jury would, hypothetically, convict the same defendant in an error-free trial. Rather, the Sixth Amendment and Const 1963, art 1, § 20 require that our focus be on whether *this* jury's verdict was affected by *this* error in *this* trial. *Sullivan*, 508 US at 279-280. Returning to the present case, this distinction matters. We should be far less dependent than appellate courts usually are on a strength-of-the-evidence analysis to help us determine whether there was outcome-determinative prejudice. The jury, having been asked by the prosecutor to "focus" on the "when I got caught" statement, complied with that request by asking for the statement to be replayed during their deliberations (not once, but thrice), and proceeded to return their verdict shortly thereafter. Without such a record, the strength of the evidence might well tip in favor of concluding that the error caused no prejudice. But here, the "prejudicial effect . . . is demonstrated by . . . the jury's behavior during its deliberations." *Hunter*, 397 Md at 597.

In any event, although the evidence against defendant was substantial, I would not characterize it as overwhelming. The prosecution's strongest evidence was hearsay evidence of Teresa Allen identifying her assailant as "Chicago" and perhaps "Rogers."[2] Although the evidence was admissible under an exception to the hearsay rule for dying declarations, MRE 804(b),[3] there was no opportunity, through cross-examination or otherwise, to probe Allen's opportunity to observe the assailant or her level of confidence or certainty in what she was saying. Such evidence, though admissible under the hearsay exception, is not "of the same value and weight as the testimony of a witness given in open court[.]" *People v Ludkowitz*, 266 NY 233, 242; 194 NE 688 (1935) (quotation marks and citation omitted).

Another shooting victim, Jasper Charleston, testified at trial and identified defendant as the shooter by pointing him out in the courtroom. But Charleston had seen the shooter for only a few seconds and did not know who they were at the time. More significantly, Charleston failed to identify defendant in a photographic lineup before trial. Our Supreme Court recently held under similar circumstances that such first-time-in-court identifications are highly suggestive and therefore carry serious reliability concerns that implicate a defendant's due-process rights. *People v Posey*, 512 Mich 317, 332-340; 1 NW3d 101 (2023) (opinion by BOLDEN, J.); *id*. at 361-385 (CAVANAGH, J., concurring); *id*. at 390 (WELCH, J., concurring). Although defendant does not raise a *Posey* claim on appeal challenging the admissibility of Charleston's identification testimony as such, the *Posey* Court's admonition regarding the significantly reduced reliability of such in-court identifications necessarily factors into any strength-of-the-evidence analysis.

---

[2] The jury also asked to review this evidence on the final morning of its deliberations.

[3] The hearsay exception for dying declarations, codified at MRE 804(b)(2) at the time of trial, is now in MRE 804(b)(3).

-5-

The jury also saw surveillance camera footage from two different days of figures entering the house where the shooting took place. In the footage taken on the day before the shooting, the individual's face is briefly visible, and at trial Curtis Williams identified defendant (whom he knew) as the individual shown. In the footage taken on the day of the shooting and shortly before the shooting occurred, only the back of the individual could be seen, not the person's face, and the jury was left to compare the two videos (along with side-by-side still images presented as an exhibit) to consider whether they were the same individual. The person appeared to be wearing light-colored gloves, and police later found white gloves at defendant's residence. The prosecutor also argued that a stitching pattern on the rear of the individual's jeans matched the jeans defendant was wearing when he was arrested in Chicago.

This evidence was substantial and would certainly survive a sufficiency-of-the-evidence review following a motion for directed verdict or on appeal. But here, "[t]he inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error." *Kotteakos*, 328 US at 765. And the evidence was not so overwhelming that we can simply disregard the jury's "focus" on defendant's "when I got caught?" statement at the behest of the prosecutor who argued that it proved consciousness of guilt. The record shows that the prosecutor's misleading argument about this statement affected the jury's verdict.

The plain-error test requires us to consider one final question, whether "the error seriously affected the fairness, integrity or public reputation of judicial proceedings independent of the defendant's innocence." *Carines*, 460 Mich at 763-764 (cleaned up). It did; indeed, "this is the sort of error that compromises the fairness, integrity, and truth-seeking function of a jury trial." *People v Shafier*, 483 Mich 205, 224; 768 NW2d 305 (2009). Encouraging a jury to infer consciousness of guilt from a defendant's recorded statement while keeping the jury in the dark about the known relevant context in which the statement was made "cast[s] a shadow on the integrity of our state's judicial processes." *Id*. Because this error "most certainly affected the fairness of the judicial proceeding," *People v Bailey*, 330 Mich App 41, 67-68; 944 NW2d 370 (2019), the plain-error test is satisfied.

One additional issue worth considering is whether defendant's trial counsel was constitutionally ineffective by allowing all this to occur. Defendant argues on appeal that his trial counsel performed deficiently by not insisting that the entire recording of the police interrogation be admitted under the "rule of completeness," but I agree with the majority that it was sound trial strategy to keep out potentially prejudicial evidence of unrelated drug charges. Had defendant's trial counsel known at the outset that the prosecutor was likely to zero in on the "when I got caught" statement during the closing argument, counsel could have insisted that the statement be excluded from what was played to the jury. But here too I agree with the majority that, under these circumstances, counsel did not perform deficiently by failing to anticipate what would happen— essentially, that the prosecutor would weaponize the redactions in the recording against defendant in this way. See *Harrington v Richter*, 562 US 86, 110; 131 S Ct 770; 178 L Ed 2d 624 (2011) ("Just as there is no expectation that competent counsel will be a flawless strategist or tactician, an attorney may not be faulted for a reasonable miscalculation or lack of foresight or for failing to prepare for what appear to be remote possibilities."). Finally, for the reasons discussed, defense counsel did not perform deficiently by not objecting to the prosecutor's closing argument because no curative instruction would have been adequate. So the error here is solely attributable to the prosecution, not defense counsel.

To conclude, it is often said that a defendant in a criminal case is entitled to a fair trial, but not a perfect trial.  E.g., *People v Solloway*, 316 Mich App 174, 201; 891 NW2d 255 (2016); *People v Abraham*, 256 Mich App 265, 279; 662 NW2d 836 (2003).  In this case, though, an atypical series of events—namely, key facts #1, #2, and #3 as discussed above—combined to transform defendant's trial into one that was not merely imperfect, but, in my view, unfair.  Because the prosecutor made materially misleading statements about the evidence and expressly encouraged the jury to focus on that evidence, and the jury then specifically asked to examine that evidence shortly before returning a verdict finding the defendant guilty, the verdict is tainted.  I would therefore reverse defendant's conviction and remand for a new trial, so I respectfully dissent.

/s/ Daniel S. Korobkin