985 A.2d 72

Willie Lee **PARKER**

v.

**STATE of Maryland.**

No. 1351, Sept. Term, 2006.

Court of Special Appeals of Maryland.

Dec. 29, 2009.

476

---

Juan P. Reyes (Nancy S. Forster, Public Defender, on brief), for Appellant.

Robert Taylor, Jr. (Douglas Gansler, Atty. Gen., on brief), for Appellee.

Panel: SALMON, DEBORAH S. EYLER and MEREDITH, JJ.

Opinion by MEREDITH, J.

A jury in the Circuit Court for Washington County convicted Willie Lee Parker, appellant, of the crime of retaliation against a witness, in violation of Maryland Code (2002, 2005 supp.), Criminal Law Article ("CrL"), § 9–303. Parker raises four issues, which we quote in the order in which we will address them:

1. Is [CrL] § 9–303 unconstitutionally vague?

2. Was the evidence legally sufficient to sustain Appellant's conviction?

3. Did the trial court err in refusing to declare a mistrial [after the prosecutor alerted the jury to a prior conviction of the appellant]?

4. Did the trial court err in allowing the prosecutor to ask improper "were they lying" questions?

We conclude that the statute is not unconstitutionally vague, and that there was sufficient evidence to sustain appellant's conviction for threatening to harm another in retaliation for a witness's testimony. But we conclude that the prosecutor's reference to appellant's prior conviction was unduly prejudicial, and that appellant's request for a mistrial should have been granted. We vacate the judgment and remand for further proceedings. For the guidance of the trial court, we also agree with the appellant that it was improper for the prosecutor to ask appellant whether other witnesses had been lying when they testified.

## Factual Background

Willie Lee Parker and Wendy Swan were arrested by Detective Todd Dunkle and charged separately with narcotics offenses. Swan had had a romantic relationship with Parker, and is the mother of his child. The two were prosecuted separately. Swan's case was tried before a jury in the Circuit Court for Washington County on January 10, 2006. Parker

attended Swan's trial, at which Det. Dunkle was a principal witness. Throughout the day of Swan's trial, Parker appeared agitated and angry, and he glared at Det. Dunkle and other witnesses. At the end of the day, Swan was convicted.

After the conclusion of Swan's trial, Det. Dunkle left the courthouse, accompanied by Assistant State's Attorney Brett Wilson and two or three other police officers who had been involved in the case. When they walked out the front door of the courthouse, Det. Dunkle noticed Parker standing at the top of the steps. Their eyes met, and Det. Dunkle and his group walked past.

Det. Dunkle testified that, when he reached the bottom of the courthouse steps, he heard Parker say to him: "Now that you fucked with my family, I'll be fucking with yours." Det. Dunkle turned around and approached Parker. According to Det. Dunkle, he asked Parker: "What did you just say? Did you just threaten my family?" And he heard Parker respond: "Yes, you ruined my family, so I'll ruin yours. You made it personal first." Det. Dunkle became angry, and he acknowledged that he "had some colorful words to say back" to Parker "because [Parker] made the threat against my children and my wife." The others accompanying Det. Dunkle persuaded him to calm down and walk away from the confrontation with Parker.

Later that day, Det. Dunkle initiated charges against Parker for violating CrL § 9–303(a), which provides:

(a) *Prohibited.*—A person may not intentionally harm another, threaten to harm another, or damage or destroy property with the intent of retaliating against a victim or witness for:

(1) giving testimony in an official proceeding; or

(2) reporting a crime or delinquent act.

Three days later, on January 13, 2006, Parker went to the District Court of Maryland for Washington County and filed an application for statement of charges against Det. Dunkle, alleging harassment. In the application, Parker recited his version of what was said on the courthouse steps. Parker

asserted that he was being harassed by Det. Dunkle on January 10, 2006, and that the officer had a history of harassing Parker. On January 17, 2006, Parker filed a similar application for statement of charges against Officer Robison, one of the officers who was with Det. Dunkle at the courthouse during the confrontation on January 10, 2006. No charges were issued for either police officer as a consequence of Parker's claims.

Parker was tried on the retaliation charge initiated by Det. Dunkle. At the conclusion of a jury trial in the Circuit Court for Washington County, Parker was convicted and sentenced to seven and one-half years of imprisonment. Parker noted this appeal. Additional details about the trial proceedings will be discussed below.

## Discussion

### 1. CrL § 9–303 is not unconstitutionally vague.

Parker contends that CrL § 9–303 is unconstitutionally vague on its face. Appellant maintains that § 9–303(a) is so general in the manner it proscribes threats of harm with the intent to retaliate that it (a) is fatally vague and ambiguous, and (b) does not provide fair notice as to precisely what actions are prohibited by the law. We disagree.

As the Court of Appeals explained in *Galloway v. State*, 365 Md. 599, 610–11, 781 A.2d 851 (2001) (internal quotation marks and citations omitted), *cert. denied*, 535 U.S. 990, 122 S.Ct. 1547, 152 L.Ed.2d 472 (2002): "In determining the constitutionality of statutes, [t]he basic rule is that there is a presumption that the statute is valid.... We are reluctant to find a statute unconstitutional if, by any construction, it can be sustained." When the challenge to a statute is based on vagueness, "[t]he party attacking the statute has the burden of establishing its unconstitutionality." *Id.* at 611, 781 A.2d 851.

"A penal statute is vague if it violates the cardinal requirement that it be sufficiently explicit to inform those who are subject to it what conduct on their part will render them

liable to its penalties." *Eanes v. State,* 318 Md. 436, 459, 569 A.2d 604 (1990) (citations omitted). A statute may be void for vagueness if it lacks fixed enforcement standards or guidelines. *Id.* "The touchstone is whether persons of common intelligence need reasonably guess at its meaning." *Id.* (quotation marks and citations omitted). *See also Bowers v. State,* 283 Md. 115, 125, 389 A.2d 341 (1978) (a statute is not unconstitutionally vague where the words used "possess a common and generally accepted meaning").

We summarized the principles governing review of a challenge to the vagueness of a statute as follows in *Jeandell v. State,* 165 Md.App. 26, 33–34, 884 A.2d 739 (2005), *rev'd on other grounds,* 395 Md. 556, 910 A.2d 1141 (2006):

In *Williams v. State,* 329 Md. 1, 616 A.2d 1275 (1992), the Court of Appeals discussed the void-for-vagueness doctrine, and noted that it "requires that a penal statute 'be sufficiently explicit to inform those who are subject to it what conduct on their part will render them liable to its penalties.'" *Id.* at 8, 616 A.2d 1275 (quoting *Connally v. General Const. Co.,* 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322 (1926)). Quoting from *Williams, supra,* and *Bowers v. State,* 283 Md. 115, 389 A.2d 341 (1978), the Court further elaborated upon the doctrine in *Galloway v. State,* 365 Md. 599, 615–16, 781 A.2d 851 (2001):

A well grounded principle in federal constitutional law is that, when considering the void-for-vagueness doctrine, courts consistently consider two criteria or rationales. *See, e.g., Williams,* 329 Md. at 8, 616 A.2d at 1278; *Eanes [v. State],* 318 Md. [436] at 459, 569 A.2d [604] at 615; *Bowers,* 283 Md. at 120–21, 389 A.2d at 345. The first rationale is the fair notice principle that "persons of ordinary intelligence and experience be afforded a reasonable opportunity to know what is prohibited, so that they may govern their behavior accordingly." *Williams,* 329 Md. at 8, 616 A.2d at 1278 (internal quotation marks omitted) (quoting *Bowers,* 283 Md. at 121, 389 A.2d 341); *see Ferro v. Lewis,* 348 Md. 593, 607, 705 A.2d 311, 318 (1998). The standard for determining whether a statute provides fair notice is

"whether persons 'of common intelligence must necessarily guess at [the statute's] meaning.' " *Williams,* 329 Md. at 8, 616 A.2d at 1278 (alteration in original) (quoting *Broadrick v. Oklahoma,* 413 U.S. 601, 607, 93 S.Ct. 2908, 2913, 37 L.Ed.2d 830 (1973)). A statute is not vague under the fair notice principle if the meaning "of the words in controversy can be fairly ascertained by reference to judicial determinations, the common law, dictionaries, treatises or even the words themselves, *if* they possess a common and generally accepted meaning." *Bowers,* 283 Md. at 125, 389 A.2d at 348 (emphasis added) (citations omitted); see *Eanes,* 318 Md. at 460, 569 A.2d at 615–16.

The second criterion of the vagueness doctrine regards enforcement of the statute. This rationale exists "to ensure that criminal statutes provide 'legally fixed standards and adequate guidelines for police, judicial officers, triers of fact and others whose obligation it is to enforce, apply and administer the penal laws.' " *Williams,* 329 Md. at 8[-]9, 616 A.2d at 1278 (quoting *Bowers,* 283 Md. at 121, 389 A.2d 341). To survive analysis, a statute must "eschew arbitrary enforcement in addition to being intelligible to the reasonable person." *Williams,* 329 Md. at 9, 616 A.2d at 1279. In *Bowers,* we determined that, as to this standard, a statute is not unconstitutionally vague

merely because it allows for the exercise of some discretion on the part of law enforcement and judicial officials. It is only where a statute is so broad as to be susceptible to irrational and selective patterns of enforcement that it will be held unconstitutional under this second arm of the vagueness principle.

283 Md. at 122, 389 A.2d at 346; *see Eanes,* 318 Md. at 464, 569 A.2d at 617.

As a general rule, the application of the void-for-vagueness doctrine is based on the application of the statute to the "facts at hand." *Bowers,* 283 Md. at 122, 389 A.2d at 346 (citations omitted).

The *Galloway* Court further observed that "it will usually be immaterial that the statute is of questionable applicability in foreseeable marginal situations, if a contested provision clearly applies to the conduct of the defendant in a specific case." 365 Md. at 616, 781 A.2d 851 (quoting *Bowers*, 283 Md. at 122, 389 A.2d 341 (citing *United States v. Petrillo*, 332 U.S. 1, 7, 67 S.Ct. 1538, 91 L.Ed. 1877 (1947))). The Court noted, however, that a statute that potentially infringes upon the freedom of expression guaranteed by the First Amendment may be challenged as vague on its face. *Galloway*, 365 Md. at 617, 781 A.2d 851. As the Court of Appeals explained in *Bowers*, 283 Md. at 122–23, 389 A.2d 341:

> A different rule governs, however, where the statute in question appears to intrude upon fundamental constitutional liberties, particularly the First Amendment guarantees of free speech and assembly. In such cases, not only may the two vices of inadequate notice and insufficient adjudicative guidelines be present, but in addition the indefiniteness of the statute itself may inhibit the exercise of protected freedoms. *Winters v. New York*, 333 U.S. at 509, 68 S.Ct. 665; *United States v. National Dairy Corp.*, 372 U.S. at 36, 83 S.Ct. 594.
>
> "[T]here is [in these cases] the danger that the state will get away with more inhibitory regulation than it has a constitutional right to impose, because persons at the fringes of amenability to regulation will rather obey than run the risk of erroneous constitutional judgment." Note, 109 U. Pa. L.Rev. at 80.

On account of this "chilling effect" which vagueness can exert on First Amendment liberties, the Supreme Court has stated that whenever a criminal statute may, because of imprecise draftsmanship, impact upon free speech rights, the void-for-vagueness doctrine "demands a greater degree of specificity than in other contexts." *Smith v. Goguen*, 415 U.S. at 573, 94 S.Ct. 1242; *accord, Hynes v. Mayor of Oradell*, 425 U.S. at 620, 96 S.Ct. 1755; *cf. Coates v. City of Cincinnati*, 402 U.S. 611, 614, 91 S.Ct. 1686, 29 L.Ed.2d 214 (1971) (ordinance held unconstitutionally vague because it

conditioned exercise of right of assembly upon unascertainable standard). Translated, this principle of strict specificity means that where First Amendment values are at least potentially involved, the statute is to be tested for vagueness *on its face*. *Smith v. Goguen*, 415 U.S. at 573, 94 S.Ct. 1242; *Winters v. New York*, 333 U.S. at 509, 68 S.Ct. 665. So considered, the principle is essentially a rule of standing, permitting a defendant to challenge the validity of a statute as applied to marginal cases, even though the acts for which he has been charged may be squarely within the coverage of the statute. Note, 109 U. Pa. L.Rev. at 97. Once it is determined, however, that a strict specificity standard ought to apply in any given case, the criteria for measuring the validity of a statute under the vagueness doctrine are the same as in a non-First Amendment context: fair warning and adequate guidelines.

■ The statute challenged in the case before us is sufficiently clear that there is no need to look beyond its language to understand its meaning. *Grandison v. State*, 390 Md. 412, 445, 889 A.2d 366 (2005). The words "threaten to harm" are unambiguous in the context of CrL § 9–303. The purpose of the law is plain: to enable individuals to report criminal activity or participate in official proceedings without fear that they will be retaliated against for doing so. The statute's purpose clause states in pertinent part:

> FOR the purpose of prohibiting a person from harming another, threatening to harm another, or damaging or destroying property with the intent to induce a victim or witness not to report the existence of facts relating to a crime or delinquent act; ... prohibiting a person from threatening to harm another with the intent of retaliating against a victim or witness for giving testimony in an official proceeding or for reporting a crime or delinquent act....

2005 Md. Laws, Chapter 461.

The statute is " 'sufficiently explicit to inform those who are subject to it what conduct on their part will render them liable to its penalties.' " *Williams, supra*, 329 Md. at 8, 616 A.2d

1275 (quoting *Connally v. General Const. Co.*, 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322 (1926)). And the operative phrase "threaten to harm another" has "a common and generally accepted meaning," *Bowers, supra*, 283 Md. at 125, 389 A.2d 341, such that " 'persons of ordinary intelligence and experience [are] afforded a reasonable opportunity to know what is prohibited, so that they may govern their behavior accordingly.' " *Williams, supra*, 329 Md. at 8, 616 A.2d 1275 (quoting *Bowers, supra*, 283 Md. at 121, 389 A.2d 341).

The law clearly applies to the facts alleged in this case. When viewed in a light most favorable to the State, the evidence showed that a police officer who investigated a crime and testified in a trial that led to a conviction was told by an associate of the convicted person, in an angry voice, "now that you fucked with my family, I'll be fucking with yours.... Yes, you ruined my family, so I'll ruin yours." This comment was made directly outside the courthouse, within minutes after the jury's verdict had been returned. There can be no question that the words "I'll be fucking with your[ family]" would be perceived by a witness as a retaliatory threat of harm. Section 9–303 is intended to prevent persons from tampering with testimonial proceedings by threatening, intimidating, or retaliating against witnesses. Any person of ordinary intelligence would know that approaching a witness and expressing an intent to "fuck with" or "ruin" the witness's family would be viewed as conduct threatening harm in retaliation for the witness's participation in the proceeding. The statute is adequately clear to inform members of the public that such conduct is prohibited. The circuit court was correct in ruling that this law is not unconstitutionally vague.

### 2. The evidence was legally sufficient to sustain the conviction.

Parker contends that the State's evidence was legally insufficient to sustain his conviction under CrL § 9–303(a) for intentionally threatening to harm Det. Dunkle's family in retaliation for Det. Dunkle's testimony in Swan's January 2006 trial. A jury's verdict will not be disturbed on appeal if, "after

viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)(emphasis in original); *see Harrison v. State,* 382 Md. 477, 487–88, 855 A.2d 1220 (2004); *Moye v. State,* 369 Md. 2, 12–13, 796 A.2d 821 (2002).

Parker contends that the statute requires proof that Parker intended to cause physical or bodily harm to Det. Dunkle at the time Parker made his comments, and that there was insufficient evidence that Parker so intended. According to Parker, "[t]he issue is whether there was sufficient evidence to find that Appellant intentionally threatened to physically harm Officer Dunkle with the intent to retaliate for his testimony." Parker argues that the evidence showed that Parker filed an application for statement of charges against Det. Dunkle in the District Court three days after the confrontation at the courthouse, and that the pursuit of such legal action was what he was alluding to when he exchanged words with Det. Dunkle on the day of Swan's trial. Parker asserts: "There is no evidence that Appellant ever intended to inflict bodily harm. . . . No rational trier of fact could have found that he intended to inflict bodily harm beyond a reasonable doubt."

We reject Parker's interpretation of what the State must prove to support a conviction under CrL § 9–303(a). The portion of the statute that is pertinent to the communication between Parker and Det. Dunkle provides that "[a] person may not intentionally . . . threaten to harm another . . . with the intent of retaliating against a . . . witness for: (1) giving testimony in an official proceeding; or (2) reporting a crime or delinquent act." The essential elements of the statutory offense that was charged in this case are: (1) that the defendant made an intentional threat to harm another person; and (2) that the defendant made the threat with the intent of retaliating against a witness who had testified in an official proceeding. Those elements were proved by the evidence presented in this case.

■ Contrary to Parker's argument, the statute does not require a threat of *physical* harm. Nor does the statute require that the threatened harm be directed at the witness (as opposed to the witness's family members or others). Nor does the statute require proof that the party making the threat had an actual intent to commit the harm to another. The critical element is the threat of harm, intentionally communicated to the witness for the purpose of retaliating against the witness.

If the jury viewed all of the evidence in a light most favorable to the prosecution, the jury could have found that Det. Dunkle was a witness who had testified in an official proceeding against Swan, who was the mother of Parker's child. Because the outcome of the official proceeding against Swan was not in accordance with Parker's wishes, the jury could have properly inferred from the evidence that Parker had a motive to retaliate against Det. Dunkle, and further, that Parker had the intent to retaliate against Det. Dunkle when Parker uttered the threatening words on the courthouse steps. And the jury could have reasonably found that Parker said to Det. Dunkle: "Now that you fucked with my family, I'll be fucking with yours." Additionally, the jury could have found that Parker confirmed that his statement was intended to be a threat when the detective asked him directly, "Did you just threaten my family?" Parker responded: "Yes, you ruined my family, so I'll ruin yours. You made it personal first." Those statements supported a finding that Parker, acting in retaliation for a witness's testimony, had intentionally threatened to harm another.

As noted above, the test for evidentiary sufficiency is whether, after viewing the evidence in a light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson*, supra, 443 U.S. at 319, 99 S.Ct. 2781; *see State v. Stanley*, 351 Md. 733, 750, 720 A.2d 323 (1998). When the evidence in this case is viewed in that light, the evidence was legally sufficient to support the conviction for a violation of CrL § 9–303.

### 3. The court erred in denying the motion for mistrial.

Prior to the start of the trial, defense counsel alerted the court to his concern that, in the retaliation case, the jury might be prejudiced by the fact that the alleged retaliation involved a witness in a drug prosecution. The court agreed that, subject to the court's further ruling, there should be no references to the underlying facts of other cases. The discussion on Parker's motion in limine was as follows:

[DEFENSE COUNSEL]: ... [I]t's kind of an odd issue in the sense that Officer Dunkle just testified at my client's ex-girlfriend's trial. It was a drug distribution trial. The charges here today have to do with her trial [that] was concluded, it's retaliatory in nature, and I believe letting this jury hear that it was a drug distribution trial or that Mr. Parker was still facing that [sic] would prejudice this jury against my client.... I don't think the jury should be polluted with knowing that it was a drug distribution trial.... So I'd ask the Court to instruct the witnesses not to mention his ex-girlfriend's criminal conduct or his that were past or present that day.

[PROSECUTOR]: Your Honor, I think we're talking about two separate trials here. There was a trial that took place on January 10th, in this building, that involved Wendy Swan. That's the alleged facts that this case is involved in, the defendant's alleged girlfriend. There was then a trial approximately two months later, March the 9th, where the Defendant himself was convicted. If [Defense Counsel] is arguing that that proceeding is not relevant to this proceeding, the State's not necessarily going to disagree....What happened with Wendy Swan is very relevant and is essential for the State to prove its case because that goes to the whole nature, how did Detective Dunkle mess up the Defendant's family, in the Defendant's words. But as for the Defendant's trial itself and what happened to the Defendant, the State agrees that that may not necessarily be relevant.

[DEFENSE COUNSEL]: I didn't imagine the State was going to re-litigate Wendy Swan's case. I thought it was just going to mention, he was at her legal proceeding....

\*       \*       \*

THE COURT: What I'm going to do is grant in part the Motion *in Limine*. And I will instruct the State that you may certainly inquire briefly into the nature of why everybody was here for a legal proceeding.... But I don't know the fact that it was a drug distribution proceeding is necessarily relevant to the jury's determination in this matter. So I think you'll have to be very careful, and we may have to address some of the issues on a question by question basis. But I want the State to limit its testimony in regard to what kind of ... case proceeding it was on January the 10th.

\*       \*       \*

[DEFENSE COUNSEL]: So the fact that Mr. Parker was present at a legal proceeding wherein a woman was convicted is permissible?

THE COURT: Yes.

\*       \*       \*

[PROSECUTOR]: And one other clarification, Your Honor, ... if the Defendant elects to testify, ... that the Defendant's prior record, if it's relevant for impeachment purposes, is still admissible.

THE COURT: Well we'll get there when we get there. I don't know about that. I'll reserve on that request.

[PROSECUTOR]: Yes sir.

When Det. Dunkle testified, he was asked whether he saw Parker when leaving the courthouse on January 10. Det. Dunkle replied: "I looked at him ..., gave a quick glance, because I know his personality. I've dealt with him in the past. Other officers have dealt with him." At a later point in his testimony, Det. Dunkle added: "I know Mr. Parker is a local. I didn't think he would be very difficult to find."

When the prosecutor asked Det. Dunkle if he had previously had "any type of altercation with the Defendant," the officer replied: "No. I mean other than disagreements on maybe the reasons I might have stopped him on any given night like, you know, 'You don't have a right to stop me.' I'm like, 'Yeah, I do. Give me a minute.' "

Before Parker took the stand to testify in his own defense, the court and counsel reviewed with Parker whether his prior conviction for conspiracy to distribute CDS would come into evidence if Parker testified. The following conference took place at the bench:

[DEFENSE COUNSEL]: Mr. Parker, we've reached the point in the case that we can choose to present a defense or not. You have an absolute right to testify.... If you do cho[o]se to testify, the State may seek to impeach you with crimes of moral turpitude or other issues. I'd ask the State now what they intend on using against you so you can decide whether or not you want to testify. Mr. [Prosecutor], do you intend on asking him about any criminal priors?

[PROSECUTOR]: 1997 conviction for a CDS.... Well, actually, conspiracy to distribute CDS, not marijuana. It was in the Circuit Court for Washington County.

[DEFENSE COUNSEL]: It's a conspiracy charge?

[PROSECUTOR]: Yes.

THE COURT: I'm going to deny the State's request to cross-examine on the . . . . . ., to raise that issue.

[DEFENSE COUNSEL]: So, Mr. Parker, the State's not going to be allowed to ask you about that criminal prior as long as you don't open the door, you know, in a big way. Do you want to testify at this time? You don't have to.

DEFENDANT PARKER: Yes.

[DEFENSE COUNSEL]: No one is going to hold it against you.

DEFENDANT PARKER: Yeah, I want to testify.

THE COURT: All right.

Parker testified that he was standing outside the courthouse, smoking a cigar, when Det. Dunkle and his group came out. He gave the following account:

Q [by Defense Counsel]: Did eventually ... you and Officer Dunkle get into some sort of verbal disagreement?

A: He turned around after he left out the courthouse and said what did I say about his family, and I told him, "I ain't said shit about your family."

*     *     *

Q: Did there come a point in time that you got off the ramp area and got onto the step area in front of the courthouse?

A: I got at ......, to the top of the steps.

Q: And what happened when you were on the top of the steps?

A: Officer Dunkle had started cussing at me, and I started cussing back at him.

Q: Do you remember anything that he said to you?

A: He was like, "You don't want to f'ing make this personal." I was like, "You already did." You know, what I mean? And I ......, we was just pretty much ......, I was calling him names, he was calling me names.

Q: Did you ever threaten him?

A: No.

Q: Did you ever threaten his family?

A: No.

Q: Prior to his testimony today, did you even know that he was married?

A: No.

Q: Did you know that he had children?

A: No.

Q: Do you know where he lives?

A: No.

During the cross-examination of Parker, the following exchange took place:

Q  [by the Prosecutor]:  Now, sir, you testified that police officers harassed you, isn't that right?

A:  That's right.

Q:  In fact, Detective Dunkle had investigated you, isn't that true?

A:  That's correct.

Q:  And that investigation led to you being convicted, isn't that right?

[DEFENSE COUNSEL]:  Objection.

THE COURT:  Sustained.

[DEFENSE COUNSEL]:  Move for mistrial please.

[PROSECUTOR]:  Your Honor, the Defendant opened the door by arg......, by saying police officers harassed him.

[DEFENSE COUNSEL]:  If we could approach, Your Honor?

THE COURT:  The objection is sustained.

Parker contends on appeal that the circuit court should have granted his motion for a mistrial because the prosecutor's reference to his prior conviction deprived him of a fair trial. We agree.

■  We note that the State has not raised any issue as to preservation, and we deem the issue adequately preserved by Parker's motion for mistrial.  *See* Maryland Rule 4–323(c), relative to objections other than rulings on evidence: "For purposes of review by the trial court or on appeal of any other ruling or order, it is sufficient that a party, at the time the ruling or order is made or sought, makes known to the court the action that the party desires the court to take on the objection or the action of the court."  Here, Parker's request for a mistrial was plainly stated, and the court's refusal to permit counsel to approach the bench to argue the motion in greater detail effectively denied the motion.

The State argues on appeal that "it seems likely that the conviction to which the State was referring [in the question asked on cross-examination of Parker] was not the 1997 conviction, which the court had excluded, but the March 9,

2006, conviction which had come shortly after Parker's threats." The State suggests that the prosecutor perceived a need to ask about the conviction because Parker had testified that he had "fil[ed] harassment charges against two officers that constantly just pull me over, harass me constantly." But during arguments on Parker's motions in limine, the prosecutor had conceded that the 2006 conviction was not relevant to the retaliation charge, stating: "There was then a trial [on] ... March the 9th, where the Defendant himself was convicted. If [Defense Counsel] is arguing that that proceeding [*i.e.,* the one that resulted in the conviction on March 9, 2006] is not relevant to this proceeding, the State's not necessarily going to disagree." Further, when defense counsel inquired of the State what prior convictions the prosecution "intend[s] on using against you so you can decide whether or not you want to testify," the March 9, 2006, conviction was not mentioned by the prosecutor.

The State further argues that the trial court did not abuse its discretion in refusing to grant a mistrial. Generally, the decision to grant or deny a mistrial is committed to the discretion of the circuit court. Our review "is limited to determining whether there has been an abuse of discretion." *Coffey v. State,* 100 Md.App. 587, 597, 642 A.2d 276 (1994). The Court of Appeals has held that a trial court's denial of a motion for mistrial will not be reversed "unless the defendant was so clearly prejudiced that the denial constituted an abuse of discretion." *Hunt v. State,* 321 Md. 387, 422, 583 A.2d 218 (1990), citing *Johnson v. State,* 303 Md. 487, 516, 495 A.2d 1 (1985). But the Court of Appeals has found reversible error in a trial court's failure to grant a mistrial in cases in which there was a high probability that the improper reference influenced the jury's verdict. *E.g., Rainville v. State,* 328 Md. 398, 411, 614 A.2d 949 (1992) ("It is highly probable that the inadmissible evidence in this case had such a devastating and pervasive effect that no curative instruction, no matter how quickly and ably given, could salvage a fair trial for the defendant").

In *Kosmas v. State,* 316 Md. 587, 594–595, 560 A.2d 1137 (1989), the Court of Appeals held that the trial court erred in refusing to grant a mistrial after a witness for the prosecution made an improper reference to the defendant's refusal to take a lie detector test. After stating the general rule that "the decision of whether to grant a motion for a mistrial rests in the discretion of the trial judge," *id.* at 594, 560 A.2d 1137, the Court of Appeals noted that the key question for the appellate court is whether the defendant was so prejudiced by the improper reference that he was deprived of a fair trial. The Court stated, *id.* at 594–95, 560 A.2d 1137:

> In somewhat similar situations, involving mention of a lie detector test in connection with a witness other than the defendant, we have identified factors that should be considered in determining whether the evidence was so prejudicial that it denied the defendant a fair trial. In *Guesfeird v. State,* 300 Md. 653, 659, 480 A.2d 800 (1984), we said:
>
>> The factors that have been considered include: whether the reference to a lie detector was repeated or whether it was a single, isolated statement; whether the reference was solicited by counsel, or was an inadvertent and unresponsive statement; whether the witness making the reference is the principal witness upon whom the entire prosecution depends; whether credibility is a crucial issue; whether a great deal of other evidence exists; and, whether an inference as to the result of the test can be drawn.
>
> As we also pointed out, these factors are not exclusive and do not themselves comprise the test. The question is whether the prejudice to the defendant was so substantial that he was deprived of a fair trial, and the enumerated factors are simply helpful in the resolution of that question.

Applying the *Kosmas–Guesfeird* factors to the present case, we note that the reference was a single, isolated statement; it was an intentional statement made by the prosecuting attorney despite the trial judge's instructions and rulings on Parker's motions in limine; the party making the reference was a person of significant influence in the case and the State's

principal representative for the prosecution; although the court sustained Parker's objection, no curative instruction was requested; and no curative instruction was given. Most important, credibility was the critical issue: if the jury believed Parker's version of the incident, there was no threat to support the conviction.

In *Kosmas*, the Court of Appeals found that the potential impairment of the defendant's credibility was the deciding factor that compelled reversal of the denial of the motion for mistrial. The Court stated, *id.* at 598, 560 A.2d 1137:

If the defendant is believed in those areas in which his testimony conflicts with that of [the two witnesses for the prosecution], the State's case is very weak. Again, then, it is apparent that the issue of the defendant's credibility is a central and crucial factor in this case, and the State's evidence that does not hinge at least in part upon the determination of that credibility is hardly of sufficient strength to permit us to find beyond a reasonable doubt that the inadmissible evidence did not in any way influence the verdict.

Similarly, in Parker's case, because the jury's finding on the critical issue—what Parker said to Det. Dunkle on the courthouse steps—depended on the jury's assessment of the credibility of the witnesses, we cannot conclude beyond a reasonable doubt that the prosecutor's reference to a prior conviction did not in any way unfairly influence the verdict. The prosecutor's act of informing the jury that Parker was a convicted criminal "almost certainly had a substantial and irreversible impact upon the jurors, and may well have meant the difference between acquittal and conviction." *Rainville, supra,* 328 Md. at 410, 614 A.2d 949.

Although Parker requested no curative instruction, this was a case in which any curative instruction was likely to exacerbate the harm by re-emphasizing the information the jury was not supposed to have heard in the first instance. Because this case turned upon whether the jury believed the testimony of Det. Dunkle or the contrary testimony of the defendant, "[i]t

is highly probable that the [prosecutor's reference to Parker's prior conviction] had such a devastating and pervasive effect that no curative instruction, no matter how quickly and ably given, could [have] salvage[d] a fair trial for the defendant." *Id.* at 411, 614 A.2d 949. *See* 5 LYNN MCLAIN, MARYLAND EVIDENCE § 103:10 (2d ed. 2001) 55–57 ("The efficacy of an instruction to disregard is questionable. Not only may jurors not be able to erase from their minds the inadmissible information they have heard, but an instruction to disregard may emphasize it.... And, where the error complained of is particularly egregious, the courts will find the instruction to disregard insufficient to cure the resulting prejudice." (Footnotes omitted.)). *See also Medical Mut. Liab. Ins. Soc. v. Evans,* 330 Md. 1, 24, 622 A.2d 103 (1993) ("the prejudice resulting from the improper cross-examination of [defendant's claims manager] transcended the curative instruction, and ... the trial court abused its discretion in denying the motion for a mistrial"). Although we are generally reluctant to overrule a trial court's refusal to grant a mistrial, we conclude that the case before us presents one of those rare instances in which the denial of the motion for mistrial constituted an abuse of discretion. Accordingly, we must vacate the judgment and remand for a new trial.

### 4. "Were they lying?" questions.

■ During cross-examination of Parker by the prosecutor, the following exchange occurred:

Q [By the prosecutor]: Well you were there when Detective Dunkle and Mr. Wilson came out, isn't that right?

A: I was ..., I was leaving as they were leaving, yes.

Q: And then you said something to Detective Dunkle.

A: No sir, I didn't.

Q: In fact didn't you say, "Now that you fucked with my family, I'll be fucking with yours"?

A: No sir, I didn't.

Q: So Detective Dunkle is lying?

A: Yes sir.

Q: And Assistant State's Attorney, Brett Wilson, is lying?

A: Yes sir.

Q: And anyone else who may have heard that comment is lying?

A: Anyone that got on the stand and said they heard that comment is lying.

Q: So everyone's lying here today except for you?

A: I don't have a reason to lie.

Q: I'm not asking you if you had a reason. I'm just simply asking you, you're the only one telling the truth, is that right?

A: Yes, they are lying.

Q: Well, Detective Dunkle turned and asked you if you threatened his family, didn't he?

A: He asked me what did I say about his family.

Q: And you then responded, "Yes, you ruined my family, so I'll ruin yours. You made it personal first." Didn't you say that?

A: No, I did not say that.

Q: So if Assistant State's Attorney, Brett Wilson, heard that he's lying?

[DEFENSE COUNSEL]: Objection, argumentative.

A: He's lying.

THE COURT: Overruled.

Q: And, sir, Detective Dunkle again, he's not telling the truth then in regards to that statement?

A: He's not.

Q: And Detective Lehman, who testified from that witness stand that he heard you make a comment about family, he's also not telling the truth then.

A: Detective Lehman, I don't believe he said anything about family.

Q: Well if [sic] would have said it, that's not true then? What . . . . . ., what he testified to is not true?

A: If he were to say it, no, it would not be true.

■ Parker contends that the prosecutor's questioning requires reversal on two grounds: first, asking one witness whether another witness was lying is error, and, second, the questioning was improperly argumentative. Although Parker's single belated objection was not sufficient to preserve this argument for appeal, because the issue is likely to arise again upon retrial, we comment briefly on the issue for the benefit of the trial court. We agree that the prosecutor's series of questions was improper, and that a timely objection should have been sustained. *See* JOSEPH F. MURPHY, JR., MARYLAND EVIDENCE HANDBOOK § 1303 (3d ed. 1999) ("The most frequent impropriety [in impeachment techniques] seems to involve arguing the credibility of other testimony.... Such interrogation is totally objectionable. *American Stores Co. v. Herman,* 166 Md. 312, 314–15, 171 A. 54, 55 (1934).").

A review of the transcript in this case illustrates one of the problems that arises from questions that ask one witness if another witness was lying. When the prosecutor began the series of questions, the prosecutor accurately quoted Det. Dunkle's testimony asserting that Parker had said: "Now that you fucked with my family, I'll be fucking with yours." But no other witness testified to those specific words having been said.

Det. Lehman recalled hearing Det. Dunkle ask, "What did you say?" Det. Lehman testified that when Parker responded, Lehman heard Parker "distinctly saying, 'You fucked with my family.'" But Det. Lehman did not corroborate the alleged threats, *viz.,* "I'll be fucking with yours" and "I'll ruin yours."

Assistant State's Attorney Brett Wilson also failed to confirm either of the specific threats that Det. Dunkle had testified to. Mr. Wilson recalled:

I remember the jawing escalating and specifically remember a loud......, the Defendant yelling, "You ......, you fucked up my family. I'm going to......", or "I'm something......", at which point I don't recall what the ending of that sentence was because I turned immediately, Detective Dunkle turned immediately, and we began proceeding

back towards where the Defendant was which was still at the top of the steps. And he was leaning forward and continued......, well the first thing I remember is Detective Dunkle asking, "What did you say about my family?" And at that point, Mr. Parker continued saying, "You fucked up my family. You fucked up my family. It's personal. It's personal." I remember that being said over and over again as we walked back towards him.

\* \* \*

Q: ... [W]hat exactly did Detective Dunkle do?
A: He turned, and 1 turned, and he proceeded walking back towards the Defendant. And as I stated, he asked, you know, "What did you say about my family?" And we were moving back towards him, that's when the Defendant continued to say, "You f'ed up my family. It's personal."

Although both Det. Lehman and Mr. Wilson corroborated some details about the encounter, neither of them testified to the specific threats that Det. Dunkle had testified to. As a consequence, several of the prosecutor's questions about whether Lehman and Wilson were lying when they testified to the same facts as Det. Dunkle were not supported by the record.

In *Hunter v. State*, 397 Md. 580, 919 A.2d 63 (2007), which was decided after Parker's trial, the Court of Appeals disapproved of this Court's ruling in *Fisher v. State*, 128 Md.App. 79, 149–53, 736 A.2d 1125 (1999), and held that the "were the other witnesses lying" form of cross-examination is not permitted. The *Hunter* Court explained, 397 Md. at 595–96, 919 A.2d 63:

[P]etitioner was asked five questions that put him in a position of characterizing the testimony of two other witnesses. He was asked five "were-they-lying" questions. These questions were impermissible as a matter of law because they encroached on the province of the jury by asking petitioner to judge the credibility of the detectives and weigh their testimony, *i.e.*, he was asked: "And the detective was lying?" The questions also asked petitioner

to stand in place of the jury by resolving contested facts. Moreover, the questions were overly argumentative. They created the risk that the jury might conclude that, in order to acquit petitioner, it would have to find that the police officers lied. The questions were further unfair because it is possible that neither the petitioner nor the police officers deliberately misrepresented the truth. These questions forced petitioner to choose between answering in a way that would allow the jury to draw the inference that he was lying or taking the risk of alienating the jury by accusing the police officers of lying. Therefore, the trial court erred in allowing the State to ask petitioner "were-they-lying" questions. When prosecutors ask "were-they-lying" questions, especially when they ask them of a defendant, they, almost always, will risk reversal.

In the 2008 Cumulative Supplement to Judge Murphy's treatise, MARYLAND EVIDENCE HANDBOOK, *supra*, § 1303, he notes that two judges dissented in the *Hunter* case "on the ground that 'were they lying' questions 'serve to highlight, in oftentimes lengthy and complicated trials, the contradictions that the jury must consider in assessing credibility.' [397 Md. at 605, 919 A.2d 63.]" Judge Murphy comments:

> The dissenting opinion fails to recognize the difference between: (1) the permissible "do you dispute ..." question—which does not ask the witness to read someone else's mind, and (2) the improper "was that witness lying ..." question, which is both impossible to answer and unfair when employed *ad nauseam* (as it was in this case).

As in *Hunter*, the "were-they-lying" questions the prosecutor asked Parker were improper.

**JUDGMENT OF THE CIRCUIT COURT FOR WASHINGTON COUNTY VACATED; CASE REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION; COSTS TO BE PAID BY WASHINGTON COUNTY.**